No. 105,828

STATE OF KANSAS, *Appellee*, v. DEWHITE B. CAMERON, *Appellant*.

(329 P.3d 1158)

Opinion filed July 25, 2014.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Lesley A. Isherwood*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: DeWhite Cameron appeals from his jury convictions of one count of felony murder and one count of aggravated battery arising from the injuries sustained by two young children.

Cameron lived in a house in Wichita with Shaneekwa Saunders and her three boys, Sedrick and 2-year-old twins Damion and Trayvion, and her young daughter Sanna.

On the morning of September 19, 2008, a neighbor across the street from Cameron started to walk to a store when he heard Cameron calling out that his son was not breathing. The neighbor told Cameron to call 911, but Cameron said he had no telephone. The neighbor returned to his own house and directed Diane Davis, a woman who was visiting, to call 911.

Davis testified that she went across the street and into Cameron's house. She saw two small children eating something off the floor and another little boy standing with his hands behind his back facing a corner. Davis asked the boy in the corner where his father was, and the boy replied, "Well, I can't talk to you because I'll get in trouble."

Cameron then walked in the house through a back door and took Davis to a hallway where another child was lying on the floor. The child was not breathing and had scratches on his neck and bruises on his face. He was wearing a diaper that looked like it had not been changed for a couple of days. Cameron told Davis that the child had fallen off the potty and hit his head. Cameron proceeded to press on the child's chest and slap the child's face, and Davis heard a liquid, gurgling sound coming from the child's chest.

When paramedics arrived, Davis noticed that one of the younger boys had bruises and scratches much like the unconscious child's injuries, and she encouraged the paramedics to take that child with them to the hospital. As Davis was walking away from the house, she overheard that child tell another neighbor, Euva Parker, "My daddy did it."

Parker, who lived four houses down the street from Cameron, testified that she heard Davis running out of Cameron's house screaming to call the police, which prompted Parker to check on what was wrong. Parker entered Cameron's house and, upon seeing a little boy lying on the floor with his twin brother standing over him, asked Cameron what had happened. He responded that the child fell out of the bathtub and had water in his lungs. She

asked Cameron again, and this time he responded that the child had fallen off the toilet and hit his head.

Cameron told Parker the other children were in the kitchen. When she looked in the kitchen, she saw the little girl sitting on the floor eating cereal and Sedrick standing in the corner facing the refrigerator. Sedrick did not move from the corner during the entire time Parker was there, and he told her that he could not talk because he would get in trouble. Parker noticed that both of the twins had similar patterns of scratches and bruises. Parker returned and watched Cameron pushing on Damion's chest and slapping his face. Parker heard liquid sounds coming from the child's chest, and Cameron again told her that the child had fallen in the bathtub.

Parker and Davis escorted the two remaining children to Parker's house. While they were walking down the street, Sedrick told Parker, "My daddy hurt my brother." When Parker said, "What?" Sedrick responded, "My daddy hurt my brother, he make my brother not breathe." There was testimony that Sedrick routinely referred to Cameron as his "daddy."

Another neighbor watched Cameron take a black trash bag out of his house, return to the house, and then go back outside and walk over to a tree in his backyard. About 5 to 10 minutes later, the neighbor heard and saw the ambulance arrive at Cameron's house. A police officer later went into Cameron's backyard and located a bag of trash containing a towel that had fresh blood on it.

The paramedics who responded to the call found Damion lying unresponsive on the floor. Cameron told one of the paramedics that Damion had fallen in the bathtub and hit his head. Lieutenant Thomas Benefiel of the Wichita Fire Department also arrived in response to the 911 call. He asked Sedrick what had happened, and Sedrick responded, "Daddy got mad."

When Damion arrived at the hospital, his heart was not beating and his airway was full of blood. The medical staff was able to resuscitate Damion briefly and reestablish a heart beat. Shortly afterward, however, a pair of blood-flow scans showed that Damion was brain dead. Trauma surgeon Dr. Don Vasquez concluded that

the injuries leading to his death occurred within 6 hours of his death.

An autopsy showed that the cause of Damion's death was multiple blunt-force traumas and brain swelling. At least 20 blunt-force injuries were identified on his head. Three physicians testified that the traumas were so severe that the injuries would have become critical almost immediately.

Dr. Vasquez took special notice of Trayvion, observing that he lacked the affect of a typical 2-year-old child and that he looked like he "had been in a bar fight." He had two black eyes, cuts on his lip, and a scratch on the front of his neck. A CT scan revealed that Trayvion had what appeared to be a "healing liver laceration," which is an injury that Dr. Vasquez had never seen in an infant. Trayvion also had a fractured rib and a bruised lung.

The other children were brought into the hospital for examination. Sedrick asked Kim Tanner, a registered nurse, whether his father was in jail. She asked why he would be in jail, and then she asked Sedrick whether his father had spanked his brothers. He replied, "No, he whooped [or whupped] them."

The State charged Cameron with one count of felony murder for the death of Damion and one count of aggravated battery for the injuries to Trayvion. A jury found Cameron guilty of both charges. The trial court sentenced Cameron to a hard 20 life sentence for murder and a consecutive high-end guideline sentence of 172 months ' imprisonment for the aggravated battery.

*Involuntary Manslaughter as a Lesser Included Offense of Felony Murder*

Cameron contends that he was entitled to an instruction on involuntary manslaughter as a lesser included offense of felony murder because the evidence would have supported a conviction based on reckless conduct.

After Cameron's trial, the legislature amended the first-degree murder statute, K.S.A. 21-3401. The recodified statute, K.S.A. 2013 Supp. 21-5402(d) states that the provisions of K.S.A. 2013 Supp. 21-5109 relating to lesser included crimes are not applicable to murder in the first degree under K.S.A. 2013 Supp. 21-

5402(a)(2), which defines felony murder. See L. 2013, ch. 96, sec. 2. The legislature also inserted a subsection (e) to 21-5402, which reads: "The amendments to this section by this act establish a procedural rule for the conduct of criminal prosecutions and shall be construed and applied retroactively to all cases currently pending." L. 2013, ch. 96, sec. 2.

Following oral argument in this case, we issued our opinion in *State v. Todd*, 299 Kan. 263, Syl. ¶ 4, 323 P.3d 829 (2014), in which we determined that the amendments in K.S.A. 2013 Supp. 21-5402 eliminated lesser included offenses of felony murder and that the amendments are to be applied retroactively. The issue of involuntary manslaughter as a lesser included offense of felony murder is therefore without merit, and by operation of the statute, it was not error for the trial court to fail to give the instruction that Cameron requested.

*Reckless Aggravated Battery as a Lesser Included Offense of Intentional Aggravated Battery*

The jury convicted Cameron of intentional aggravated battery against Trayvion. On appeal, Cameron contends that it was reversible error not to instruct the jury on a theory of reckless aggravated battery.

At trial, Cameron objected to the instruction on intentional aggravated battery "as not being supported by the evidence." Cameron did not object to the instruction based on an argument that a lesser included offense instruction of reckless aggravated battery was appropriate. On appeal, however, he changed his challenge to the battery instruction to one of a failure to add a lesser included offense instruction. Because Cameron did not raise this objection or propose the lesser included offense instruction to the trial court, the standard of review is clear error. See, *e.g.*, *State v. Tapia*, 295 Kan. 978, 995, 287 P.3d 879 (2012); *State v. Ellmaker*, 289 Kan. 1132, 1139, 221 P.3d 1105 (2009), *cert. denied* 560 U.S. 966 (2010) (changing the theory of an objection to an instruction from trial to appeal is tantamount to not having objected below because trial court did not have opportunity to consider particular argument).

When a party fails to object to the failure to give an instruction, including raising a lesser included offense instruction, reversal is not permitted unless the failure to give that instruction is clearly erroneous. K.S.A. 22-3414(3); *State v. Cheffen*, 297 Kan. 689, 703, 303 P.3d 1261 (2013). In order to establish that the failure to give an instruction was clearly erroneous, the reviewing court must initially determine whether there was error at all. This requires demonstrating that giving the instruction would have been legally and factually appropriate based on an unlimited review of the entire record. If the court finds error, it moves to an inquiry of whether reversal is warranted based on an assessment of whether it is firmly convinced that the jury would have reached a different verdict if the instruction had been given. 297 Kan. at 703.

At the time of the crime, K.S.A. 21-3414(a) defined aggravated battery. K.S.A. 21-3414(a)(1) required a showing that the defendant acted "intentionally"; K.S.A. 21-3414(a)(2) required a showing that the defendant:

"(A) recklessly caus[ed] great bodily harm to another person or disfigurement of another person; or

"(B) recklessly caus[ed] bodily harm to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted."

Reckless aggravated battery is a lesser included offense of intentional aggravated battery. See *State v. McCarley*, 287 Kan. 167, 177-78, 195 P.3d 230 (2008).

Cameron presented no evidence showing that he engaged in reckless conduct toward Trayvion, and he did not argue that his conduct was reckless. He instead contended that he simply was not the cause of Trayvion's injuries. The contemporaneous statements of the other children strongly suggested that Cameron had beaten both the twins. The testimony of medical professionals showed that Trayvion had suffered multiple injuries over a period of time, some perhaps weeks earlier and some perhaps that day.

Cameron argues on appeal that the jury might have speculated that the injuries were the result of an indifference to the imminence of danger to Trayvion rather than the products of intentional acts of violence, but this speculation lies at the far end of what the

evidence could have proven. The multiple injuries suffered by Trayvion over a period of time persuade us that no jury reasonably would have found beyond a reasonable doubt that Cameron engaged in merely reckless conduct toward Trayvion.

Even if we were to find that the failure to give the lesser included offense instruction constituted error, it did not rise to the level of clear error. The evidence, consisting of the out-of-court statements of Trayvion's older brother Sedrick and the testimony of the medical professionals, strongly implicated Cameron in the intentional aggravated battery of Trayvion.

Under the clear error standard of K.S.A. 22-3414(3), the defendant bears the burden of firmly convincing the court that the jury would have reached a different verdict if an asserted instructional error had not been committed. *State v. Williams*, 295 Kan. 506, 516, 286 P.3d 195 (2012). The tenuous nature of Cameron's argument for the reckless aggravated battery instruction, combined with the compelling evidence supporting intentional aggravated battery, leads us to conclude that it was not clear error to omit the instruction that was not requested.

We therefore find no reversible error in the failure to give a reckless aggravated battery instruction.

*Sedrick's Out-of-Court Statements*

On the day of Damion's death, his older brother Sedrick made statements to various people implicating Cameron as the cause of Damion's and Trayvion's injuries. Before the trial, Cameron sought to disqualify Sedrick as a witness, arguing that his young age rendered him unable to distinguish between truth and falsehood. The court elected to allow Sedrick to testify, but his trial testimony contradicted statements that other witnesses had already ascribed to him.

Well after those witnesses had testified, Cameron moved for a mistrial, arguing that Sedrick's testimony was so detached from reality that he was unqualified to be a witness and was therefore not subject to cross-examination. The trial court reiterated its earlier findings that Sedrick was qualified and held that Cameron had

waived his right to cross-examine. Cameron reasserts this issue on appeal.

The decision to grant or deny a motion to disqualify a witness is reviewed for abuse of discretion. See *State v. Thrasher*, 233 Kan. 1016, 1018-19, 666 P.2d 722 (1983). A court abuses its discretion if it takes action that is arbitrary, fanciful, or unreasonable; that is based on an error of law; or that is based on an error of fact. *Fischer v. State*, 296 Kan. 808, Syl. ¶ 8, 295 P.3d 560 (2013). Because the statutory grounds for disqualifying a witness require a finding of fact, the third part of the test is at issue here.

Cameron's theory regarding the trial error in allowing the out-of-court statements is unclear. He appears to argue that the statements were inadmissible hearsay, but he did not raise contemporaneous objections. He also appears to argue that the trial court erred when it held that Sedrick was a qualified witness, but he does not specifically appeal that decision. Finally, he appears to request a de novo review of his assertion that Sedrick was unavailable for cross-examination, but he did not contemporaneously raise that objection at trial.

Cameron filed a pretrial motion to disqualify Sedrick as a witness because he was 3 years and 11 months old at the time of Damion's death and was "not capable of understanding the duty of a witness to tell the truth." A hearing was held to determine whether Sedrick was qualified. He was examined and cross-examined at that hearing. In denying the motion, the judge stated:

"I have observed [Sedrick], I have observed him take the oath, I have observed him testify, answer questions of counsel. At this time, I believe that he is a qualified witness. However, as I also said, that is subject to change, because, unfortunately, young people of [Sedrick's] age, five years and the like, could at other times not be qualified."

Several witnesses testified that Sedrick implicated Cameron as the individual who caused Damion's death. These statements included: "My daddy did it," "My daddy hurt my brother," "[H]e make my brother not breathe," "Daddy got mad," and "He whooped them." After those witnesses had testified, Sedrick was called as a witness. He was 5 years old and in prekindergarten at the time of the trial.

When asked what happened to Damion, Sedrick testified, "He got dead." When asked, "What got him dead?" Sedrick said, "God." He also testified that Trayvion and their sister were not in the house when Damion died. When asked what was going on in the house when Damion died, Sedrick testified, "Nothing." And when asked what made Damion lie down in the hallway, he testified, "Hisself."

The prosecution then asked Sedrick what he told the neighbor ladies about how Damion died. He answered, "Cause God. . . . Because God killed him." The following dialogue ensued:

"Q: Okay. Was anybody mad at Damion that morning?
"A: No.
"Q: Did you tell Ms. Euva somebody was mad at you that morning?
"A: Yes.
"Q: Who did you say was mad at you?
"A: Nobody.
"Q: Who did you say was mad at Damion?
"A: Nobody."

Shortly afterward, this dialogue took place:

"Q: What did you tell the firemen?
"A: My brother died.
"Q: You told the firemen your brother died?
"A: Yes.
"Q: Did you tell the firemen why your brother died?
"A: Yes.
"Q: What did you tell them?
"A: Because God.
"Q: Did you talk to—did you go to the hospital?
"A: Yes.
"Q: And when you were in the hospital, did you talk to the nurses?
"A: Yes.
"Q: And did you talk to them about Damion?
"A: Yes.
"Q: What did you tell the nurses about Damion?
"A: Cause God did it.
"Q: Did you—just a second. Sedrick, can you look at me. When you talked to those nurses, did you tell them about Damion?
"A: Yes.
"Q: What did you tell them about Damion? Can you look up at me, Sedrick.
"A: That he died.

"Q: That he died?
"A: Yes.
"Q: Did you tell them what happened to him in the house that day?
"A: Yes.
"Q: What did you tell them?
"A: He died.
"Q: Did you tell them why he died?
"A: Because God did it.
"Q Okay. Did you see your brother get hurt?
"A: Yes.
"Q: What did you see, Sedrick? Can you look at me. What did you see?
"A: Something that I don't know.
"Q: You saw something that you don't know?
"A: Yes.
"Q: Sedrick, is it something that you don't know, or is it something that you don't want to talk about?
"A: Don't want to talk about.

. . . .

"Q: "When you were telling the nurses about what happened to Damion—
"A: Yes.
"Q: —what did you tell them?
"A: God got him. Got him. Got him.
"Q: I heard you, dear. Did you—you know, it occurs to me, Sedrick, that God may mean different things to different people. When you say 'God did it,' what do you mean?
"A: That he did it.
"Q: How did God do it?
"A: He made him.
"Q: Look at me. What?
"A: He made him.
"Q: He made who?
"A: Trayvion die. I mean Damion die.
"Q: How did God make Damion die?
"A: He just did it by hisself."

The direct examination continued in a similar vein for a short time, when objections from defense counsel based on repetitious questioning brought the testimony to a close. The court then specifically found that it still had not seen anything indicating that Sedrick was not a competent witness. Following that judicial determination, defense counsel elected not to cross-examine Sedrick.

K.S.A. 60-407 provides that every person is qualified to be a witness unless otherwise provided by statute. K.S.A. 60-417 pro-

vides that a trial judge is to disqualify a witness if the judge finds that the proposed witness is incapable of expressing himself or herself concerning the subject of testimony so as to be understood by the judge and jury or if the proposed witness is incapable of understanding the duty of a witness to tell the truth.

The burden of establishing the incompetence of a witness lies with the party challenging competence. *State v. Warden*, 257 Kan. 94, 123, 891 P.2d 1074 (1995). Age alone is not a valid criterion for disqualification. *State v. Winkel*, 243 Kan. 570, 573, 757 P.2d 318 (1988).

It must be noted initially that Cameron did not object to Sedrick's out-of-court statements as the various witnesses presented them to the jury. This court still adheres to the requirement that appellate review of the admission of evidence through questions to witnesses and their answers is permitted only when a party preserves the issue by way of a contemporaneous objection. K.S.A. 60-404; *State v. Bridges*, 297 Kan. 989, Syl. ¶ 13, 306 P.3d 244 (2013). Outside of a pretrial motion to disqualify Sedrick as a witness because he might be unable to distinguish truth from untruth, the record contains no objection before or during the witnesses' testimony.

When Davis began her testimony about what Sedrick told her, the record shows that counsel approached the bench. The transcript then records: "(An off-the-record discussion was had by Court and counsel at the bench out of the hearing of the jury and the reporter.)" The transcript does not indicate what the topic of the discussion was or whether the judge made any sort of ruling. Although Cameron asserts that the off-the-record discussion involved the introduction of the out-of-court statements, it is impossible to ascertain from the record whether that was the case or how the trial court ruled. Furthermore, no hint of an objection was raised when the other two witnesses testified about Sedrick's out-of-court statements.

Cameron had the opportunity to cross-examine Sedrick but elected not to do so. Although Cameron contends that Sedrick was "unavailable" for cross-examination, Sedrick testified at some length under direct examination, contradicting the testimony of the

three earlier witnesses about what he told them. The trial judge twice found that Sedrick was qualified to testify, once at the pretrial motion hearing and again during a break in his testimony.

Out-of-court statements are inadmissible at trial unless the State can prove that the person making the statement is unavailable and that the defendant had a prior opportunity to cross-examine the declarant. *State v. Johnson*, 297 Kan. 210, 224, 301 P.3d 287 (2013). Cameron's counsel never attempted to cross-examine Sedrick, perhaps believing that his testimony supported Cameron's position or perhaps believing that cross-examination of a frightened 5-year-old child would be prejudicial to his case. Either way, there is no evidence before this court that Sedrick was unavailable. The court found Sedrick was qualified to testify, he did in fact testify, and the defense waived the right to cross-examine him.

We conclude there was no error in admitting the out-of-court statements.

*Constitutional Presumption of Innocence*

Jury Instruction No. 8 read: "Your concern in this case is determining if the defendant is guilty or not guilty. The disposition of the case thereafter is a matter for determination by the court." Cameron contends on appeal that the language of this instruction unconstitutionally shifted the burden to him to prove that he was not guilty.

Because Cameron failed to object to the instruction, this court applies a clearly erroneous standard of review. See K.S.A. 22-3414(3); *State v. Raskie*, 293 Kan. 906, 921-22, 269 P.3d 1268 (2012).

In *Raskie*, this court considered a nearly identical argument. There, we held that this instruction, based on PIK Crim. 3d 51.10, should be read together with other instructions that define the jury's duty and the burden of proof borne by each party. When the instructions as a whole set out the proper burden of proof, the challenged instruction was an accurate statement of the law and did not improperly shift the burden of proof to the defendant. 293 Kan. at 922.

In the present case, Instruction No. 2 explained to the jury:

"The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilty unless you are convinced from the evidence that he is guilty.

"The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of any of the claims required to be proved by the State, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you should find the defendant guilty."

In Instruction No. 4, the court informed the jury that the burden of proving the required criminal intent "never shifts to the defendant."

Because these other instructions clearly and accurately stated the burden of proof, the challenged instruction did not dilute or undermine the presumption that Cameron was not guilty. See *Raskie*, 293 Kan. at 922.

### Evidence Supporting Felony Murder

Cameron argues that because Damion did not die until he was at the hospital, his killing did not occur "in the commission of . . . an inherently dangerous felony." He contends that Damion died "long after" the child abuse had ended, thus taking away a temporal relationship between the abuse and the death.

When the defendant challenges the sufficiency of the evidence used to prove the elements of felony murder, the standard of review is whether, after reviewing all the evidence as viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Phillips*, 295 Kan. 929, 940, 287 P.3d 245 (2012).

In order to establish felony murder, the State must prove two causation elements. First, the death must lie within the res gestae of the underlying crime, which is defined in this context as acts committed before, during, or after the happening of the principal occurrence, when those acts are so closely connected with the principal occurrence as to form, in reality, a part of the occurrence. Second, the felony and the homicide must have a direct causal connection, which exists unless an extraordinary intervening event

supersedes the defendant's act and becomes the sole legal cause of death. *State v. Berry*, 292 Kan. 493, 498, 254 P.3d 1276 (2011).

Cameron does not argue that there was an extraordinary intervening event between the child abuse and the child's death. To be sure, the medical staff was able to resuscitate Damion for a short time, but there is no suggestion in the record that anything other than the injuries that he sustained from the abuse directly caused his death.

Cameron's argument instead focuses on whether the acts leading to the death were part of the res gestae of the underlying crime, child abuse. Cameron apparently contends that the death was too remote in time to qualify as a killing done before, during, or after the principal occurrence.

This situation is markedly different from the one that the court confronted in *Berry*, where the court wrestled with the temporal connection between the underlying felony and the act that resulted in the victim's death. There, the question revolved around the connection between a traffic fatality and a cocaine possession charge. Here, the underlying felony was essentially the same as the cause of death; the two occurrences were inextricably intertwined.

The evidence that was presented to the jury established a compelling case that Damion was killed as a direct consequence of child abuse. It would not have mattered if Damion had actually died weeks or months after the abusive conduct; the commission of the crime of child abuse was identical in time to the cause of death resulting in the murder.

## Jury Misled by Prosecutor's Comments

Cameron asserts that the State repeatedly misled the jury in setting out the burden of proof, both during voir dire and during closing argument.

When reviewing allegations of prosecutorial misconduct, this court first considers whether the comments were outside the wide latitude allowed the prosecutor in discussing the evidence. If they were, the court next determines whether the improper comments prejudiced the jury against the defendant and denied the defendant a fair trial. In this analytic step, the court considers three fac-

tors: (1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of the jurors. None of these three factors is individually controlling. *State v. Novotny*, 297 Kan. 1174, 1188, 307 P.3d 1278 (2013).

During closing argument, the prosecutor made the following statements to the jury:

"We move the evidence from this courtroom to you for your reasonable, common sense assessment of what you know fits. There are a number of circumstances that you will work together, after that door closes, to determine what makes sense here. What is reasonable and what is not reasonable. What does not fit with our common sense. . . . Do not speculate, decide this case based on what you heard in this courtroom and your common sense.

. . . .

"Now we move in this case to what happened on that morning on Erie. When you try to go through the idea of is it possible someone else was there? Possible, that's not the test. The test is reason, common sense. Beyond a reasonable doubt. It's not beyond—remember the words, the words are not beyond all doubt. In life we have possibilities."

The State did not define "reasonable doubt," either during voir dire or closing argument. The State explicitly assured the jury that the burden of proof was reasonable doubt. For example, the prosecutor stated to one juror during voir dire:

"Well, that's—that's the test. The State has to prove the defendant's guilt beyond a reasonable doubt.

. . . .

"And we do—we have to prove the elements of the crime . . . .

. . . .

"So those things proven beyond a reasonable doubt in order to find the defendant guilty of the murder of a particular child . . . .

. . . .

"And your civil jury service is different than the application of law that's required here in making a decision. Do you understand that the burden of proof on the State is higher?"

Later during voir dire, the prosecutor asked a prospective juror, "You have to decide the testimony or proof, whether or not it proves an individual beyond a reasonable doubt of guilt; do you

understand that? . . . Under the law, one witness, if that witness convinces you beyond a reasonable doubt that the defendant is guilty, could you vote guilty?"

In *State v. Stevenson*, 297 Kan. 49, 298 P.3d 303 (2013), the prosecutor analogized reasonable doubt to a missing letter in the "Wheel of Fortune" game show. In affirming the conviction, this court noted that "the prosecutor's argument in this case did not state or imply that the State's burden of proof was anything less than beyond a reasonable doubt. In fact, the prosecutor reiterated the State's burden of proving guilt beyond a reasonable doubt." 297 Kan. at 54.

We distinguished *Stevenson* from *State v. Finley*, 273 Kan. 237, 248-49, 42 P.3d 723 (2002), where the prosecutor stated in closing argument:

" 'I would submit to you that a reasonable doubt is really nothing more than a fair doubt that's based on reason and common sense and arises from the status of the evidence. It's impossible for me to prove everything to you by an absolute certainty. At the same time, a defendant should not be convicted just on speculation and conjecture . . . .' "

In *Finley*, the court affirmed the conviction because the prosecutor's definition of reasonable doubt was adequate, even if it was not complete. 273 Kan. at 249.

In *State v. Mitchell*, 269 Kan. 349, 360-61, 7 P.3d 1135 (2000), we held that the prosecutor made an erroneous and misleading statement of law when remarking, " '[T]he State's burden of proof in this type of criminal case and in any criminal case is a common sense burden.' " But the court concluded that the single comment did not deny the defendant a fair trial, primarily because of the weight of the evidence against him and the unlikelihood that the remark changed the result of the trial. 269 Kan. at 361.

Viewing the prosecutor's statements to the jury in the context of all the statements that she made, there was no error. The prosecutor properly told the jury that it could rely on its reason and properly reinforced the concept of proof beyond a reasonable doubt.

Cameron also contends that the prosecutor made an impermissible appeal to community values during closing argument when

she stated to the jury, "The defendant committed the brutal violence that you saw here. You're not asked by the State to be inflamed by the brutality of this act, but you are asked to hold this man, who had the power that day to take a life, accountable for what he did."

In *Finley*, 273 Kan. at 243-45, this court considered whether a prosecutor improperly appealed to community values when she argued that the jury should hold the defendant accountable and that he was not accepting responsibility for what he did. This court noted that a "prosecutor's comments asking the jury not to let the defendant get away with the crime is in most instances permissible comment." 273 Kan. at 244. We see nothing more in the prosecutor's comment in the present case than a request for accountability.

We conclude that the prosecutor's statements to the jury during voir dire and closing argument lay well within the wide latitude afforded to prosecutors.

*Cumulative Error*

Finally, Cameron suggests that, even if individual assigned errors were not so egregious as to warrant reversal, when viewed collectively they denied him his right to a fair trial. This court is not required to reverse for cumulative error if the evidence against the defendant is overwhelming. *State v. King*, 297 Kan. 955, 987, 305 P.3d 641 (2013). This court will not find cumulative error when the record fails to support the errors that the defendant raises on appeal. One error, standing alone, is insufficient to support reversal under the cumulative effect rule. *Novotny*, 297 Kan. at 1191. Having found no multiple errors, we find no cumulative reversible error.

Affirmed.