NOT DESIGNATED FOR PUBLICATION

No. 117,951

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

NICHOLAS ARTHUR CLARK,
*Appellant*.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; GUNNAR A. SUNDBY, judge. Opinion filed July 5, 2019. Affirmed.

*Michelle A. Davis*, of Kansas Appellate Defender Office, for appellant.

*Michael G. Jones*, assistant county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., ATCHESON, J., and BURGESS, S.J.

PER CURIAM: At the end of a five-day trial, a jury in Leavenworth County District Court found Nicholas Arthur Clark guilty of two counts of aggravated indecent solicitation of a child and two counts of aggravated indecent liberties with a child based on sexual encounters he had with a 13-year-old girl who attended an after-school program where he worked. Clark has asserted challenges to the district court's jury instructions, evidentiary rulings, and decisions affecting trial procedures. We find no reversible error on those points and affirm the convictions and Clark's sentence.

1

Given the appellate issues, we may condense the trial evidence with the understanding the parties know well the details unrelated to our review.

Clark began working in April 2014 as a paraprofessional in an after-school program for children at a youth center on the Fort Leavenworth base. He was 21 years old. M.M., then a seventh grader, had been enrolled in the program for some time. Clark and M.M. discovered they had mutual interests and enjoyed talking with each other at the youth center during program hours.

That summer M.M. continued in the program at times corresponding to her mother's work schedule. Clark and M.M. continued their in-person friendship and began communicating through text messages and related social media. In July, they arranged to meet elsewhere after M.M. went to a girlfriend's house with her parents' permission. They met and talked with each other on a street near M.M.'s friend's house for about 15 minutes. They hugged, and Clark left.

A few days later, they again met after M.M. went to her girlfriend's house. This time Clark drove M.M. to his apartment. They watched a movie. Clark asked M.M. if she wanted to cuddle; she agreed. According to M.M., they "made out" in the living room and moved to the bedroom, where they partially undressed. Clark drove M.M. back to her girlfriend's house. Their encounter lasted several hours.

Clark and M.M. arranged three more meetings over the next week, all at Clark's apartment. M.M. later described what happened with Clark to law enforcement officers, a civilian forensic examiner, and ultimately to the jurors during the trial. In addition to M.M.'s in-court account, the jurors heard what she had said in the out-of-court interviews. Although the versions varied in the amount of detail M.M. related and in some of her

specific recollections, M.M. described serial sexual acts with Clark. At trial, M.M. focused on what happened during one of the encounters and essentially testified that the same things happened the other two times. M.M. said Clark touched her breasts and her pubic area during the last three visits to the apartment. One time Clark asked her to engage in oral sex; M.M. said she touched his penis with her hand instead. M.M. denied they had sexual intercourse. But she said Clark digitally penetrated her vagina.

Clark's relationship with M.M. came to light after M.M.'s mother discovered sexually oriented text messages on M.M.'s cell phone. M.M's parents contacted law enforcement authorities who began an investigation. As we indicated, M.M. was interviewed multiple times during that process. Investigators also recovered text messages and other evidence from her cell phone. Some of the communications were sexually suggestive exchanges, and, particularly pertinent to the criminal charges, some of those messages related to oral sex. M.M. told investigators she exchanged the messages with Clark, although he used a pseudonymous screen name.

A Lansing police officer questioned Clark after he voluntarily appeared at the law enforcement center. Clark denied any improper communication or contact with M.M. Clark permitted the officer to look at his phone and the material on it. After having Clark reload the app used for the communications, the officer found some messages corresponding to those that had already been recovered from M.M.'s phone. The officer seized Clark's phone. Law enforcement authorities later obtained a warrant to search the phone, although they found no communications with M.M. stored in the phone's memory. During the investigation, law enforcement officers interviewed a number of other witnesses, including M.M.'s girlfriend and employees of the after-school program.

The State charged Clark in February 2015 with one count of statutory rape, a felony violation of K.S.A. 2014 Supp. 21-5503(a)(3); two counts of aggravated indecent solicitation of a child, felony violations of K.S.A. 2014 Supp. 21-5508(b)(1); two counts

3

of aggravated indecent liberties with a child, felony violations of K.S.A. 2014 Supp. 21-5506(b)(3)(A); and furnishing alcohol to a minor for illicit purposes, a felony violation of K.S.A. 2014 Supp. 21-5607. The jury trial began in late January 2017.

Clark testified in his own defense and called several other witnesses during the trial. Consistent with his account to the police, he denied having anything to do with M.M. apart from their interaction at the youth center. He also denied sending text messages to M.M. that were sexually oriented or that outlined arrangements to meet with her. Clark suggested the particular app he used would have permitted someone else to create the messages and then to forward them to his phone.

During the trial, the district court dismissed the alcohol charge before submitting the case to the jury. The jury could not reach a verdict on the rape charge and convicted Clark on the other four counts. The State dismissed the rape charge rather than retry Clark.

At a later hearing, the district court sentenced Clark to concurrent 32-month terms of imprisonment for the aggravated indecent solicitation convictions to be served consecutively to concurrent 59-month terms of imprisonment for the aggravated indecent liberties convictions, yielding a 91-month period of incarceration. The district court also placed Clark on postrelease supervision for 24 months and ordered him to comply for life with the Kansas Offender Registration Act, K.S.A. 22-4901 et seq.

Clark has appealed.

As we have indicated, Clark has asserted diffuse challenges attacking the jury's guilty verdicts. We take those up as he has presented them, adding necessary factual and legal context.

*Jury Instruction on Aggravated Indecent Solicitation of a Child*

Clark contends the State failed to present sufficient evidence to convict him of aggravated indecent solicitation of a child given how the elements of the crime were set out in the jury instructions. Although we agree the wording in the two instructions outlining what the State had to prove for convictions on those charges may have been technically amiss, the phrasing injected no reversible error, especially in the absence of any trial objection from Clark. As we explain, the argument turns on shades of meaning likely lost on all but true word mavens.

We begin with K.S.A. 2014 Supp. 21-5508, the statute criminalizing aggravated solicitation of a child. Pertinent here, the statute criminalizes "persuading or attempting to persuade a child under the age of 14 years to: (1) *Commit or submit to* an unlawful sexual act." (Emphasis added.) K.S.A. 2014 Supp. 21-5508(b)(1). In turn, K.S.A. 2014 Supp. 21-5501(d) defines "[u]nlawful sexual act" as "any rape, indecent liberties with a child, aggravated indecent liberties with a child, criminal sodomy, aggravated criminal sodomy, lewd and lascivious behavior, sexual battery or aggravated sexual battery, as defined in this code." A defendant may be guilty of aggravated solicitation by trying to get a child to commit an act that would be lewd and lascivious. For example, an invitation to the child to touch himself or herself in a sexual way would violate the statute. More commonly, perhaps, a defendant may be guilty by pressuring the child to submit to a proscribed sex act with the defendant or a third person.

In this case, the district court instructed the jurors that to find Clark guilty, they had to conclude he "attempted to persuade [M.M.] to *commit* aggravated indecent liberties with a child." (Emphasis added.) The jurors were told that aggravated indecent liberties means "engaging in . . . any lewd fondling or touching of . . . the child [who is less than 14 years old] or the offender . . . with the intent to arouse or satisfy the sexual desires of either the child or the offender." The instructions for each count were identical except for the date the alleged crime happened. The State relied on text messages from Clark to M.M. suggesting she touch his penis with either her mouth or her hand as the factual basis for the charges.

On appeal, Clark argues the evidence (if believed) showed he tried to persuade M.M. to *submit to* aggravated indecent liberties with a child when he asked her to touch him sexually. Clark completes the argument by positing that M.M. could not *commit* aggravated indecent liberties with a child under the circumstances, since she would be the child identified in the crime and, thus, either would be committing the crime against herself or that he would have to be the victim and he is not a child under 14 years old. The argument certainly presents a linguistic curlicue.

Clark frames the issue as one of sufficiency of the evidence. That is, the evidence did not legally support the crime charged and then described in the jury instructions. We disagree with the characterization of the purported problem with the charges and the jury instructions. In considering a claim of insufficient evidence, we look at what was submitted to the jury in the best light for the State, as the prevailing party, and ask whether reasonable jurors could find the defendant guilty beyond a reasonable doubt. Witness credibility determinations and any conflicts in the evidence must be resolved to the State's benefit. *State v. Parker*, 309 Kan. 1, 13-14, 430 P.3d 975 (2018). Viewed that way, there was sufficient evidence that Clark invited M.M. to touch him in a lewd manner.

6

Clark's complaint really challenges the description of the elements of the crime in the jury instructions because the district court used the word "commit" rather than "submit" to outline those elements. Not surprisingly, the general rule requires that jury instructions accurately state the law and do not mislead or confuse the jurors. See *State v. Betancourt*, 299 Kan. 131, 136, 322 P.3d 353 (2014). Clark did not object in the district court to the phrasing of the instructions on aggravated solicitation of a child. While the failure to object during trial does not bar appellate review of jury instructions, we apply a more demanding standard requiring the complaining party to demonstrate clear error. To grant Clark relief for clear error, we must be firmly convinced the jury would have come to a different result absent the purported defect in the instructions. See K.S.A. 2018 Supp. 22-3414(3) (clear-error standard applicable to jury instructions given without timely objection in district court); *State v. Cameron*, 300 Kan. 384, 388-89, 329 P.3d 1158 (2014) (appellate court must be "firmly convinced" of different result to find clear error). Clark bears the burden of proving clear error. 300 Kan. at 390.

As we have indicated, the instructions read in a hypertechnical or super literal way arguably require the jurors to conclude M.M. committed the crime of aggravated indecent liberties with a child. That is, she was the perpetrator of criminal conduct rather than the victim. But such a reading of the instructions would be nonsensical in this case. Reasonable jurors would fairly understand the instructions to refer to Clark's attempt to get M.M. to participate in aggravated indecent liberties with a child, albeit as a victim. In context, we decline to find the instructions to be clearly erroneous because they used the word "commit" rather than "submit" to describe M.M.'s involvement. The instructions did not mislead or confuse the jurors. The jurors would have convicted Clark had the district court used "submit" rather than "commit" in the elements instructions. The difference in wording didn't materially redefine the crime so that the jurors would have been induced either explicitly or implicitly to convict Clark in the absence of evidence establishing his guilt of aggravated indecent solicitation of a child beyond a reasonable doubt.

Instructions using "submit" might have been linguistically (and legally) more precise. But a jury instruction is not erroneous simply because a better one might have been crafted. See *State v. Herbel*, 296 Kan. 1101, 1124, 299 P.3d 292 (2013) (Although a newer pattern jury instruction may be better than what it replaced, that didn't make the earlier instruction erroneous.). More to the point here, as we have said, the instructions on aggravated indecent solicitation of a child were not clearly erroneous. So Clark has failed to establish any legal basis for relief.

*Convictions for Aggravated Indecent Liberties with a Child*

Clark contends his convictions for aggravated indecent liberties with a child are multiplicitous, given the way the jurors were instructed on those crimes. Multiplicitous convictions generally arise when the State charges what is a single crime in more than one count, thereby exposing a defendant to multiple convictions and punishments. Pyramiding punishments for what is actually one criminal wrong violate the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights. See *State v. Pribble*, 304 Kan. 824, 826, 375 P.3d 966 (2016).

The charges filed against Clark were not themselves multiplicitous. They allege distinct incidents on different days entailing illegal conduct amounting to aggravated indecent liberties with M.M. Each charged incident properly would be considered a separate crime and, if proved, would support a separate conviction.

But Clark's argument looks at how the crimes have been described in the jury instructions—not how they were stated in the complaint. The instruction on one of the counts required the jury to find that Clark lewdly touched M.M.'s breasts on or about August 2 or August 3, 2014. The instruction for the second count required the jury to find that Clark lewdly touched M.M.'s vagina on or about August 2 or August 3, 2014.

8

Basically, M.M. testified that on each of three occasions she went to Clark's apartment, he touched her breasts and her vagina during their sexual activity there.

There is a fair argument that all of the sexual contact between Clark and M.M. during a given visit constituted one instance of aggravated indecent liberties with a child and had to be charged as a single crime. In other words, the State arguably could not have charged Clark with two counts of aggravated indecent liberties with a child for touching M.M.'s breasts and vagina during the same encounter. All of the improper physical contact would have been part and parcel of a unitary act of indecent liberties punishable as a single crime. See *State v. Sprung*, 294 Kan. 300, 306-11, 277 P.3d 1100 (2012) (multiple instances of sexual contact between defendant and victim during one incident in defendant's office constituted a single count of aggravated indecent liberties with a child and was improperly charged as two counts).

The instructions permitted the jurors to convict Clark of two counts of aggravated indecent liberties with a child for the sexual contact with M.M. occurring only on August 2 or only on August 3. We can't say that's the conclusion the jurors reached—only that they might have. It is also possible they convicted Clark on one of the counts for conduct during M.M.'s August 2 visit to his apartment and convicted him of the second count for conduct during the August 3 visit. The first scenario superficially suggests a multiplicity problem; the second does not.

The Kansas Supreme Court confronted a legally and factually indistinguishable situation in *State v. Kessler*, 276 Kan. 202, 209, 73 P.3d 761 (2003), and rejected the defendant's multiplicity argument and affirmed his conviction for two counts of aggravated indecent liberties with a child. In that case, Kessler was charged with two counts based on distinct encounters with the victim. The victim said Kessler touched his penis during each of several encounters and also touched his buttocks during one of those encounters. As in this case, the district court used instructions for each of the aggravated

9

indecent liberties counts that differed only in the alleged physical act: One alleged Kessler touched the victim's penis, and the other alleged Kessler touched the victim's buttocks. Each count identified the same nonspecific date range for the offense.

On appeal, Kessler argued the convictions were multiplicitous because the jury could have relied on improper contact during a single encounter to support both counts. The court dismissed the argument as unpersuasive. 276 Kan. at 209. The court reasoned that the verdicts established that the jurors found the victim to be a credible witness. The jurors heard the victim's account. Kessler's defense consisted of an attack on the veracity of the victim, his mother, and other witnesses for the State. Kessler did not testify but called two character witnesses. Given the jurors' credibility determination, the evidence—primarily the victim's version of what happened to him—established separate incidents supporting each of the counts. The court found that obviated any ostensible multiplicity problem with the convictions. 276 Kan. at 209.

The *Kessler* decision remains good law on this point and is binding authority. We see no principled basis for distinguishing *Kessler* factually or legally from the circumstances here. Accordingly, we find Clark's multiplicity argument lacks merit. We do, however, pause to reiterate the *Kessler* court's closing admonition on this point: "[T]he better practice would be for the jury instructions to specify the differences in the dates of the events charged or some other specific characteristics of the events to avoid any suggestion of confusion" in the face of a multiplicity claim. 276 Kan. at 209.

*Admission of Text Message Screenshots*

Law enforcement officers took photographs of text messages displayed on the screens of M.M.'s and Clark's cell phones. Some of the communications were sexually charged and, thus, tended to incriminate Clark. He objected to the admission of the

10

photographs at trial as a violation of the best evidence rule. The district court admitted the photographs, and Clark has reprised the point on appeal.

In general terms, a best evidence rule requires the production of an original document or writing in the face of a bona fide dispute over the accuracy of a copy or of witness testimony characterizing its content being offered in place of the original. The objective is to avoid inaccuracy and prevent outright fraud as to the writing's content. See *United States v. Diaz-Lopez*, 625 F.3d 1198, 1201-02 (9th Cir. 2010); 2 McCormick on Evidence § 232 (7th ed. 2016) ("The danger of mistransmitting critical facts through the use of written copies or recollection justifies preference for original documents."); 29A Am. Jur. 2d Evidence § 1035. Kansas codified a best evidence rule in 1963 and last amended the rule 30 years ago. K.S.A. 60-467. The rule requires the production of an original "writing" subject to enumerated exceptions. The term "writing" has been broadly defined in the rules of evidence to include "handwriting, typewriting, printing, photostating, photographing and every other means of recording upon any tangible thing any form or communication or representation." K.S.A. 60-401(m).

The Kansas best evidence rule shows its age when electronic or digital communication is at issue, as the Kansas Supreme Court recently recognized. *State v. Robinson*, 303 Kan. 11, 221-22, 363 P.3d 875 (2015), *disapproved on other grounds by State v. Cheever*, 306 Kan. 760, 402 P.3d 1126 (2017). The court pointed out that K.S.A. 60-467 fails to directly address materials originally generated only in an electronic format and, thus, having no distinct physical existence in the way a deed or a handwritten letter does. In *Robinson*, the court looked to the Federal Rules of Evidence and their treatment of electronic documents under the best evidence rule to augment an antiquated and largely inapt Kansas rule. 303 Kan. at 224-25. The court held that a printout of an e-mail constituted an original writing for best evidence purposes. 303 Kan. at 225.

11

Following the lead of *Robinson*, we find the photographs of the text messages to be original writings satisfying the best evidence rule. They are functionally like printed copies of e-mails. And photographs are included in the statutory definition of writings used in the rules of evidence. The law enforcement officers who took the photographs of the text messages described for the jurors what they did and testified that the photographs accurately depicted what they saw on the screens of the cell phones. That is sufficient to meet the best evidence requirements of K.S.A. 60-467 and of the *Robinson* standard for electronic media.

On appeal, Clark argues that the text messages may have been imported into his cell phone by someone hacking his account with the company that furnishes the communication app. So he disclaims authorship of the messages. Although he casts the argument as a best evidence issue, it really isn't. Clark does not dispute that the photographs accurately show what the officers saw on his cell phone or M.M.'s cell phone and, thus, the verbal content of the text messages. He isn't asserting the content of the messages had been altered in the photographs to make them appear to say something they did not.

Clark's complaint goes to the authentication or authenticity of the messages as communications he wrote. That's a different evidentiary issue. Authentication is addressed in K.S.A. 60-464 and simply requires evidence sufficient to support authenticity—the document is what it purports to be. *Robinson*, 303 Kan. at 225. Authentication, as a rule of admissibility, presents a comparatively low threshold that may be satisfied with circumstantial evidence. 303 Kan. at 225. Here, the text messages were on Clark's phone and included exchanges with M.M. The content of the messages conformed generally to M.M.'s accounts of her meetings with Clark. That sort of evidence presumably would be sufficient to authenticate the text messages, clearing the way for their admission as evidence. We needn't decide the point, since Clark has not couched his appellate argument as one based on lack of authentication. Clark's argument

that the text messages appeared on his phone not because he composed them but as the result of a hack by a third party would go to the weight rather than the admissibility of the communications as evidence. *Robinson*, 303 Kan. at 226 (upon showing of authenticity, "discrepancies and other conflicting evidence go to the weight, not the admissibility" of the material).

In sum, Clark has not shown the district court violated the best evidence rule in admitting the photographs of the text messages.

*District Court's Procedural Rulings*

Clark challenges three procedural rulings the district court made during trial: (1) instructing his lawyer to stop objecting during the testimony of a detective the State called to explain the forensic examination of Clark's cell phone; (2) dismissing a defense witness offered as an expert on interviewing child victims of sexual abuse in the midst of her testimony; and (3) requiring Clark to testify before other defense witnesses who were unavailable late in the day because the lawyer anticipated calling them the next morning. Under the circumstances, we find the district court's rulings did not materially compromise Clark's right to a fair trial and, thus, resulted in no legal prejudice requiring a remedy. But the district court's handling of those situations carried potential risks that might have been avoided. We now look at each ruling.

As the detective was explaining his examination of Clark's cell phone to the jurors, Clark's lawyer launched frequent objections to the testimony. For the most part, the district court overruled the objections. The lawyer continued to object. The district court told the lawyer the objections had become "cumulative" and were simply disrupting the flow of the detective's testimony, impeding the jurors' ability to understand the evidence. The district court characterized the lawyer's conduct as "obstructionist" and, therefore, "prohibit[ed]" the lawyer from making any more objections to the witness' testimony in

13

front of the jury. The district court said it would consider any further objections at the end of the day after the jury had been excused.

District courts enjoy wide discretion in how they conduct trials—flexibility designed to accommodate unexpected or unusual situations while preserving the parties' right to a fair hearing. See *State v. Rochelle*, 297 Kan. 32, 36, 298 P.3d 293 (2013) ("[T]he trial judge must keep order in the courtroom and has broad discretion in controlling courtroom proceedings."); *Venters v. Sellers*, 293 Kan. 87, 92, 261 P.3d 538 (2011) (district court exercises "supervisory powers" over how lawyers conduct litigation). We typically review district court decisions affecting trial procedures and receipt of relevant evidence for abuse of that discretion. A district court exceeds its discretion by ruling in a way no reasonable judicial officer would under the circumstances, by ignoring controlling facts or relying on unproven factual representations, or by acting outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011).

We need not delve deeply into this issue. Clark's trial lawyer did not offer additional objections to the detective's testimony after the district court's prohibition. That is, the lawyer voiced no objections when given the opportunity to do so at the end of the day. In the absence of any proffered objections, we cannot say Clark's defense was compromised as the result of the district court's order. On appeal, Clark has not pointed to inadmissible testimony from the detective after that order. In short, we can't say the district court committed reversible error.

Given the circumstances, we do not need to review the accuracy of the district court's assessment that Clark's lawyer had begun to lodge specious objections as a trial tactic to interfere with the orderly presentation of the detective's testimony. If the district court were mistaken, the prohibition could be treated as harmless error in the absence of

14

any objections. Even if the district court was correct in that assessment, its response may have flirted with potential trial error. Had the prosecutor elicited inadmissible and unduly prejudicial testimony from the detective, the district court eliminated any ready way for Clark's lawyer to signal the need for an immediate corrective, such as an admonition to the jurors to disregard the testimony. The cumulative impact of less harmful, though still inadmissible, testimony similarly might have been difficult to undo well after the jurors heard and contemplated the evidence. Under the district court's limitation, the soonest the jurors could have been told to disregard any improperly admitted testimony would have been the following morning.

We recognize the district court had limited options in putting an end to what it considered highly improper conduct from Clark's lawyer. Rather than altering the usual trial process by prohibiting contemporaneous objections, the district court could have warned Clark's lawyer that she would face sanctions if she persisted in making improper objections. Had the sanctions failed to garner compliance, the district court could have resorted to other remedies.

As to the second complaint, Clark called as an expert witness a nurse trained to conduct forensic physical examinations of victims of rape or other sexual assault to collect biological and other evidence and to document apparent injuries consistent with abuse. During the direct examination of the nurse, Clark's lawyer began asking questions about the proper way to interview a child victim of sexual assault. The prosecutor objected, and the nurse acknowledged she did not have any particular expertise in how those sorts of interviews should be done. Clark's lawyer, nonetheless, continued asking questions about forensic interview techniques, drawing additional objections the district court sustained. Ultimately, the district court simply terminated the examination of the nurse and excused her as a witness.

15

On appeal, Clark contends the district court's ruling impinged upon his right to present a defense. We are unpersuaded given the circumstances. First, the nurse was not qualified to provide expert testimony on the proper way to interview a child victim. So her opinions on that subject generally or how M.M. had been interviewed were inadmissible. See K.S.A. 2016 Supp. 60-456(b). Clark can't construct error from the district court's refusal to admit as evidence something that should not have been admitted.

In addition, Clark's trial lawyer did not suggest (or proffer) that the nurse would offer admissible testimony on some other relevant point. Accordingly, Clark cannot show error because the nurse was excused without finishing her testimony. See *State v. Deal,* 271 Kan. 483, 489-90, 23 P.3d 840 (2001), *overruled on other grounds by State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2006) ("Failure to make a proffer of excluded evidence precludes appellate review."). The district court's decision to abruptly excuse the witness in the midst of her testimony to the jury was, in a word, unorthodox. But we see no abuse of discretion in doing so in this particular situation, especially in the absence of a proffer from Clark's lawyer or some protest from the prosecutor, who lost any opportunity to question the witness.

Finally, Clark complains about how he had to present his own testimony to the jury. As we have indicated, Clark called several defense witnesses and also testified himself. Clark's father had concluded his testimony as a defense witness well into the afternoon on the fourth day of trial. Clark's lawyer anticipated calling the remaining witnesses, including Clark, the next morning. So those witnesses (other than Clark) were not at the courthouse. Reluctant to lose what appeared to be about an hour of available time that afternoon, the district court basically ordered that Clark should then take the stand if he intended to testify at all. Clark's lawyer indicated she wanted to present the other defense witnesses before having Clark testify. In the face of the district court's directive, however, she had Clark testify that afternoon.

16

On appeal, Clark reiterates that the district court's ruling upset his ability to present his defense. But he offers nothing more. He does not suggest he lost the opportunity to present evidence or that his testimony was somehow different or impaired because he testified late on the next to last day of trial rather than sometime on the last day. Nor does he now say he wouldn't have testified at all. Clark, therefore, has failed to show that the district court's order deprived him of a fair trial.

We, however, offer another cautionary observation. Criminal defendants have a constitutional right not to incriminate themselves protected in the Fifth Amendment to the United States Constitution. Accordingly, a criminal defendant cannot be compelled to testify. In at least some criminal cases, a defendant might choose not to testify precisely because other defense witnesses have ably presented testimony calling into question his or her guilt, substantially reducing any benefit to him or her from taking the stand and facing cross-examination. Conversely, if the defense witnesses turn out to be less compelling than anticipated, a defendant may see significant benefit in testifying. So while a district court can require a party to have witnesses available to fill trial time even if that disrupts the lawyer's desired ordering of evidence, that authority ought to be exercised with considerable circumspection when it comes to telling a criminal defendant when he or she must testify in the defense case. An order of that sort has a constitutional overlay implicating the defendant's right against self-incrimination. Here, however, that right does not appear to have been compromised, and Clark makes no such claim. So we simply say that a district court may be improvidently courting risk by ordering a criminal defendant to testify at a certain point in the defense case merely to accommodate an otherwise laudable desire to move the case along or to avoid a brief delay in presenting evidence to a sitting jury.

*Cumulative Error*

For his final point, Clark contends cumulative error deprived him of a fair trial. Appellate courts will weigh the collective impact of trial errors and may grant relief if the overall result of the imperfections deprives the defendant of a fair hearing even when the errors considered individually could be considered harmless. *State v. Smith-Parker*, 301 Kan. 132, 167-68, 340 P.3d 485 (2014). An appellate court looks at the entire trial record to assess the aggregate effect of multiple trial errors. 301 Kan. at 168.

We find no basis for granting relief to Clark based on cumulative error. We have identified a technical problem in the jury instructions on aggravated indecent solicitation of a child. To the extent that may be categorized as error, it had no significant impact on the jurors or their verdicts. Likewise, if the district court erred in requiring Clark's lawyer to hold objections to the detective's testimony until he finished or in requiring Clark to testify before some of the other defense witnesses, Clark has pointed to no actual prejudice resulting from those rulings. The other points he has raised on appeal do not amount to error at all. The combined effect of the ostensible errors was, at most, negligible and did not compromise Clark's right to a fair trial. See *State v. Cruz*, 297 Kan. 1048, 1075, 307 P.3d 199 (2013) ("As we have recognized for decades, '[a] defendant is entitled to a *fair* trial but not a perfect one[.]'") (quoting *State v. Bly*, 215 Kan. 168, 178, 523 P.2d 397 [1974]).

Affirmed.