IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 126,747

STATE OF KANSAS,
*Appellee*,

v.

JAVAN JERMAINE ERVIN,
*Appellant*.

SYLLABUS BY THE COURT

1.

Prosecutors have wide latitude to conduct the State's case in a manner that does not offend the defendant's constitutional right to a fair trial. They act within that wide latitude when they argue about evidence introduced at trial or ask the jury to draw reasonable inferences based on the evidence. But they exceed that wide latitude if they argue facts or factual inferences outside of what the evidence shows.

2.

The invited error doctrine is prudential.

3.

Where evidence at trial allows inferring that a defendant has committed a prior crime, a district judge does not commit error by giving an instruction stating there was evidence tending to prove a prior crime and limiting the reasons the jury could consider that evidence under K.S.A. 2024 Supp. 60-455.

1

4.

Generally, instructions patterned after statutes are legally proper. And if the jury instructions properly and fairly state the law and are not reasonably likely to mislead the jury, it is immaterial if another instruction, upon retrospect, is also legally and factually appropriate, even if such instruction might be clearer or more thorough than the one given.

5.

A district judge need not define widely used and readily understood terms in jury instructions, such as pursuing or pursuit. This general rule correlates with the rule that the Legislature intends to use a word in its ordinary, contemporary, and common meaning unless it provides an alternative definition.

6.

Appellate courts review the sufficiency of the evidence in the light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or weigh in on witness credibility.

7.

One requirement of proving felony murder is to establish that the death occurred within the res gestae of the charged underlying inherently dangerous felony. Res gestae is defined in this context as acts committed before, during, or after the happening of the principal occurrence, when those acts are so closely connected with the principal occurrence by time, distance, and causation as to form a part of the occurrence.

8.

Proof of a sufficient causal connection between an inherently dangerous felony that serves as the underlying crime in a felony murder charge and the murder depends on

proving a direct causal link between the two. An extraordinary intervening event may supersede the felonious act and be the legal cause of the death. Whether an event is an extraordinary intervening event turns on whether the event was foreseeable.

9.

No error occurs when a verdict form lists the option of finding a defendant guilty before the option of finding the defendant not guilty.

10.

The cumulative error doctrine does not apply when no trial error is established.

11.

Courts follow the express language used in a statute when it is plain and unambiguous, giving common words their ordinary meanings, without adding to or subtracting from the text.

12.

K.S.A. 21-6615(a) allows a jail time credit for all time a defendant is incarcerated pending the disposition of the defendant's case. A sentencing judge should thus allow credit for all days incarcerated on a case, regardless of whether the defendant received a credit for some or all that time against a sentence in another case.

Appeal from Sedgwick District Court; TYLER J. ROUSH, judge. Oral argument held October 31, 2024. Opinion filed April 11, 2025. Affirmed in part, vacated in part, and remanded with directions.

*Peter T. Maharry*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Lance J. Gillett,* assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, were with him on the brief for appellee.

3

The opinion of the court was delivered by

LUCKERT, C.J.:  Javan Ervin directly appeals his convictions on seven counts, including one for felony murder based on the underlying felony of fleeing or attempting to elude a police officer. Ervin argues he did not receive a fair trial because of errors during the prosecutor's closing arguments and in the jury instructions. He also contends the State failed to present sufficient evidence to support his felony murder conviction. We reject Ervin's arguments and affirm his convictions. But he also raises a meritorious sentencing issue. He contends the district judge erred in imposing his sentence without allowing a jail-time credit for all days he was incarcerated while awaiting judgment. Because we agree with his contention, we remand this case to the district court for entry of an amended journal entry of judgment, or for a hearing about the jail time credit if necessary.

### FACTS AND PROCEDURAL BACKGROUND

The events leading to Ervin's convictions began when he arrived at a gas station convenience store with Jaime Chavez. Law enforcement officers were at the scene waiting for Chavez, who they intended to arrest. Officers were positioned around the gas station to prevent Chavez' escape.

Ervin drove a pickup truck to the gas station. Once there, Chavez exited the passenger side of the truck and went into the convenience store. Soon after, a uniformed officer drew his gun and instructed Ervin, who was driving on a suspended license, to turn off the truck. Rather than comply, Ervin drove the truck through the parking lot, going off-road to avoid a patrol car positioned to block Chavez' escape. Ervin entered a city street and spun donuts in traffic, striking a curb and damaging the truck before speeding away. Two patrol cars pursued Ervin with lights and sirens activated. The

4

pursuing officers reached speeds of 50 to 60 miles per hour in a 40-mile-per-hour zone, but Ervin pulled away.

Meanwhile, other officers apprehended Chavez. Those officers radioed the pursuing officers to discontinue the pursuit of Ervin, which they did.

Shortly after the officers ended their pursuit, Ervin ran a red light at a busy intersection. He struck a truck driven by Jordan Peltzer, causing Peltzer's truck to spin. Peltzer hit his head hard enough to leave a bump. Ervin's truck then went up and over a median, colliding while airborne with a Mazda. The force sheared off the top of the Mazda, fatally injuring its driver, Samantha Russell. Ervin's truck rolled over 300 feet, coming to rest on the driver's side, facing south in a northbound lane. The truck's rear axle and wheels had been ripped off and flew into one of the many vehicles at the intersection. A responding officer described the scene as "[t]otal destruction."

Ervin escaped through the windshield, fleeing to a nearby apartment complex where he was later arrested.

The jury saw multiple videos and still images of the events. A video from the body camera of the officer who approached Ervin in the gas station recorded the officer's order to Ervin to turn off the truck. It also captured statements made about three minutes later giving notice of a nearby collision involving a possible fatality; that collision was the one that resulted in Russell's death. Other cameras along Ervin's route captured images of his truck and the pursuing police cars, and cameras at the intersection recorded the fatal collision, the resulting destruction, and Ervin running from the scene. Still photographs also documented the scene and the contents of the pickup.

5

In the truck's cab, investigators found two 9 mm pistols. Based on this evidence, the State charged Ervin with criminal possession of firearms by a convicted felon. During trial, Ervin stipulated that he had a prior felony conviction for robbery.

Police interviewed Ervin after his arrest. During the interview, Ervin said he was on bond in a pending case in which he was charged with a felony for fleeing or attempting to elude a police officer and he would not want to get in trouble because of that pending charge. At Ervin's trial, an officer briefly testified about Ervin's statement, but the video of the interview was not played to the jury.

The jury found Ervin guilty of first-degree felony murder of Samantha Russell, an alternative charge of second-degree murder of Russell, reckless aggravated battery of Peltzer, fleeing or attempting to elude a police officer, criminal possession of a weapon by a convicted felon, leaving the scene of an accident resulting in death, and driving on a suspended license.

He appealed directly to this court, and we have jurisdiction. K.S.A. 60-2101(b) (Supreme Court jurisdiction over direct appeals governed by K.S.A. 22-3601); K.S.A. 2024 Supp. 22-3601(b)(3)-(4) (direct appeals to Supreme Court allowed for life sentence and off-grid crimes); K.S.A. 21-5402(b) (first-degree murder is an off-grid person felony).

ANALYSIS

Ervin raises seven issues attacking his convictions and one relating to his sentence. We affirm his convictions, but vacate the jail time credit order, and remand for imposition of an allowance crediting all days he served incarcerated pending disposition of the charges.

6

ISSUE 1: NO PROSECUTORIAL ERROR IN ARGUING ADMITTED EVIDENCE

We first consider Ervin's claim that the prosecutor erred during closing argument by arguing a fact not in evidence and thus misstating the evidence. In considering this claim we apply a two-step framework.

First, we consider the prosecutor's statements in context to determine whether the prosecutor exceeded the wide latitude afforded "'to conduct the State's case in a manner that does not offend the defendant's constitutional right to a fair trial.'" *State v. Coleman*, 318 Kan. 296, 302, 543 P.3d 61 (2024) (quoting *State v. Brown*, 316 Kan. 154, 164, 513 P.3d 1207 [2022]). Prosecutors may discuss the evidence and argue reasonable inferences drawn from that evidence. But they err if they argue "a fact or factual inferences outside of what the evidence showed." *State v. Mendez*, 319 Kan. 718, 738, 559 P.3d 792 (2024).

Second, if an error is found, we consider whether the error requires us to reverse the conviction because the State failed to meet its burden under the constitutional harmless error test stated in *Chapman v. California*, 386 U.S. 18, 23-24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). Under that test, the State must prove "beyond a reasonable doubt that the error complained of . . . did not affect the outcome of the trial in light of the entire record, *i.e.*, . . . there is no reasonable possibility that the error contributed to the verdict." *State v. Sherman*, 305 Kan. 88, Syl. ¶ 8, 109, 378 P.3d 1060 (2016) (quoting *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011], *cert. denied* 565 U.S. 1221 [2012]).

As to the first prong, Ervin argues the State erred during closing argument when the prosecutor argued a fact not in evidence, specifically that Ervin was on bond for a prior charge of fleeing or attempting to elude a police officer. During closing arguments, the State made two references to Ervin's prior charge, saying Ervin "knew he was already in trouble for a prior flee and elude" and that he was "on bond for a prior flee and elude."

7

Both the State and defense agree that the only evidentiary exchange about the prior charge came during the testimony of the officer who interviewed Ervin after his arrest. The prosecutor and the officer had the following exchange:

"Q: [State]: . . . Over the course of your investigation—I don't know if you knew it prior to the interview or you learned it after, but are you aware that Mr. Ervin at the time of the crash on July 6th, at the time of your interview he had a prior pending flee and elude case?

"A:    No, I was not aware of that.

"Q:    Okay. Well, in his interview does he describe, you know, being on bond and not wanting to get in trouble because of that?

"A:    Yeah, yeah, he did.

"Q:    Okay. Refreshed your memory there. It's been a couple years.

"A:    Yeah."

The State argues this exchange provides evidence to support the prosecutor's statements or, at least, provides the basis to draw a reasonable inference that Ervin had a prior fleeing or attempting to elude charge. In doing so, the State relies on the well-established principle that prosecutors act within the wide latitude afforded when they ask the jury to "make reasonable inferences based on the evidence." *State v. Waldschmidt*, 318 Kan. 633, 655, 546 P.3d 716 (2024); *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021).

Ervin disagrees and contends the evidence is too ambiguous to allow this inference. He asserts that because the officer denied knowing that Ervin had a prior

8

fleeing or attempting to elude charge no evidence supported the prosecutor's closing argument. He concedes the exchange might support an inference that he was on bond for some offense, but he argues it does not support the specific inference that the prior charge was for fleeing or attempting to elude a police officer.

Ervin makes a good point if we focus on the initial question and answer only. But when those are placed in the full context of what the jury heard, we agree with the State that the officer's testimony provided a basis for the prosecutor's argument that Ervin knew he was already in trouble because of a prior fleeing or attempting to elude offense. In other words, the "that" referred to in the exchange between the prosecutor and the officer pointed back to the subject of a pending fleeing or attempting to elude charge. The exchange thus provided sufficient evidence to support the inference the prosecutor asked the jury to draw. We consequently reject Ervin's contention that the prosecutor made erroneous statements during closing arguments.

Because we discern no error, we need not discuss the second prong of the prosecutorial error test that requires us to consider the effect of the comments on the verdict.

ISSUE 2: NO ERROR IN GIVING A LIMITING INSTRUCTION

Building on his first argument, Ervin complains on appeal that the district judge erred by giving an instruction allowing the jury to consider his prior act of fleeing or attempting to elude a police officer. The instruction, commonly referred to as a limiting instruction because it limits the reasons a jury can consider evidence of a prior crime under K.S.A. 2021 Supp. 60-455, stated: "Evidence has been admitted tending to prove that the defendant committed a prior flee and elude other than the present crimes charged. It may be considered solely to establish the defendant's knowledge, motive, and/or absence of mistake or accident."

9

In considering this limiting instruction we apply the same three-step analysis that appellate courts apply whenever a party raises any jury instruction issue in a criminal appeal. Under this analysis, a party's failure to meet the test at any of the three steps ends the court's analysis. *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018). Under the first step, we determine whether the issue is reviewable—that is, whether there is appellate jurisdiction and whether the issue is sufficiently preserved for our review. 307 Kan. at 317. Under the second step, we analyze whether the instruction is legally and factually appropriate; this involves a merits determination of whether there was error. 307 Kan. at 317-18. Under the third step, we examine whether the jury's verdict should be reversed. 307 Kan. at 318.

Here, no argument suggests we lack appellate jurisdiction, and we have already noted the basis for our jurisdiction. Preservation presents a closer question, however. Ervin requested a limiting jury instruction before trial by filing proposed instructions and he engaged in discussions during trial about how the instruction should be worded; he did not object, however, to giving the instruction to the jury as he now does. The State thus argues he invited any error, and generally invited errors are not reviewable. See *State v. Slusser*, 317 Kan. 174, 179, 527 P.3d 565 (2023). Ervin counters that things changed after he filed his proposed instructions. The parties present lengthy arguments about how the facts of this case mesh or do not mesh with those of other cases discussing the invited error doctrine.

We decline to wade into that discussion. The invited error doctrine is prudential. See *State v. Fleming*, 308 Kan. 689, 695, 423 P.3d 506 (2018). And here we have essentially resolved the issue through our resolution of Ervin's first issue. That is because Ervin's argument is that there was no factual basis for giving the instruction. But as we have discussed, the testimony of the officer who interviewed Ervin after his arrest supplies evidence on which a reasonable jury could infer that Ervin had a pending charge

10

of fleeing or attempting to elude an officer. That evidence provided a factual basis for the instruction.

Some of Ervin's arguments might also be construed to argue that the instruction was not legally appropriate. These arguments hinge on a lack of facts. Here we have the facts, and precedent from this court strongly supports giving a limiting instruction when evidence of prior crimes has been admitted during the trial. E.g., *State v. Molina*, 299 Kan. 651, 660, 325 P.3d 1142 (2014) (quoting *State v. Breeden*, 297 Kan. 567, 579, 304 P.3d 660 [2013]). This seems especially apt here where Ervin's attorney, likely to dilute the sting of anticipated evidence about the pending charge, mentioned it during his opening statement:  "Javan Ervin. He has a suspended driver's license, he has a prior flee and elude."

But Ervin also argues the wording of the instruction was legally inappropriate because it directed the jury that there was evidence of a previous fleeing or attempting to elude offense, painting him as a repeat offender. This argument overstates the language of the instruction, which told the jury that evidence "has been admitted *tending* to prove that the defendant committed a prior flee and elude other than the present crimes charged." (Emphasis added.) The phrase "tending to prove" left room for the jury to conclude the State failed to provide such proof. And other instructions reminded the jury that its role was to consider and weigh evidence and that it should not consider counsel's statements and arguments as evidence. The limiting instruction itself then told the jury to consider the evidence for three purposes only—Ervin's knowledge, his motive, and the absence of a mistake or accident. The jury instruction properly instructed the jury on the law.

In summary, we conclude the district judge did not commit error by instructing the jury that there was evidence tending to show that Ervin had previously committed the crime of fleeing or attempting to elude a police officer and in limiting the reasons it could

11

consider that evidence. Given that the judge did not err by giving the limiting instruction, we need not consider reversibility. Cf. *State v. Hilyard*, 316 Kan. 326, 336, 515 P.3d 267 (2022).

ISSUE 3: NO ERROR IN INSTRUCTING ON RECKLESSNESS

Ervin next argues the district judge gave an improper definition of recklessness in the instruction setting out the elements the State needed to prove to establish the charge of reckless second-degree murder. He contends the judge's instruction lessened the degree of recklessness required by law because it did not tell the jury that Ervin's conduct needed to show extreme indifference to human life.

The judge instructed the jury as to the elements for the reckless second-degree murder charge by stating:

"To establish [the charge of second-degree murder], each of the following claims must be proved:

"1. The defendant killed Samantha Russell unintentionally but recklessly under circumstances that show extreme indifference to the value of human life.

"2. This act occurred on or about the 6th day of July, 2021, in Sedgwick County, Kansas.

"A defendant acts recklessly when the defendant consciously disregards a substantial and unjustifiable risk that a result of the defendant's actions will follow."

During the instruction conference, Ervin objected to this instruction because he thought the definition of recklessness was not complete without incorporating and defining the statutory element that required proof he killed "unintentionally but recklessly

12

under circumstances that show extreme indifference to the value of human life." See K.S.A. 21-5403(a)(2). The State disagreed. It contended that adding to the definition could cause confusion because other charges required a determination that Ervin acted recklessly. The State urged the court to use a consistent definition of recklessness throughout the instructions. It also contended there was no need to repeatedly tell the jury it had to find that Ervin acted with extreme indifference to human life in the second-degree murder instruction; setting out the statutory element once was sufficient, and that element did not need definitions or other elaboration.

The district judge rejected Ervin's arguments, concluding the instruction sufficed without a definition of extreme indifference, the word recklessly was defined correctly, and the lawyers could argue the point about how recklessness is distinguished in second-degree murder from recklessness in other charges. He also noted that "the instruction as given is sufficient to allow fair, reasonable argument on that point."

As this discussion reveals, Ervin preserved the argument he makes to us by raising it with the district judge. And because we have jurisdiction, we have authority to consider his argument that the instruction was legally inappropriate. We thus consider his argument, although we ultimately disagree with it and conclude the instruction mirrors statutory language and is not erroneous.

K.S.A. 21-5403(a)(2) defines reckless second-degree murder. It states: "Murder in the second degree is the killing of a human being committed . . . unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life." The Legislature has also stated that "[a] person acts 'recklessly' or is 'reckless,' when such person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 21-5202(j).

The instructions given here use this statutory language, both in their identification of the element and its definition of recklessly. "Generally, jury instructions patterned after statutes are legally proper." *State v. Hillard*, 315 Kan. 732, 776, 511 P.3d 883 (2022). As we have explained, no error thus exists "[i]f the jury instructions properly and fairly stated the law and were not reasonably likely to mislead the jury" and "'it is immaterial if another instruction, upon retrospect, was also legally and factually appropriate, even if such instruction might have been more clear or more thorough than the one given.'" *Coleman*, 318 Kan. at 313.

Here, the instruction on recklessness given on the second-degree murder count was legally appropriate. It told the jury that to convict Ervin of reckless second-degree murder it had to find that Ervin killed Russell unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life and with conscious disregard of a substantial and unjustifiable risk that circumstances exist or that a result of death will follow. Repeating the language found in the element in the definition would have been redundant and would have potentially confused the jury as to the meaning of recklessness as it moved from one instruction to another. Finally, the statutory element is clear and easily understood. We thus hold the district judge did not err when he refused to reword or add to the instruction.

The instruction was factually appropriate as well. The evidence was sufficient to allow a reasonable jury to conclude beyond a reasonable doubt that Ervin's driving fell within the statutory definition of recklessness and showed an extreme indifference to human life.

We conclude the judge did not err by refusing to modify the instruction as requested by Ervin. We thus need not engage in a prejudice analysis. Cf. *Hilyard*, 316 Kan. at 336.

14

ISSUE 4: PURSUIT NEEDED NO DEFINITION

We next consider Ervin's argument that the district judge needed to define what is meant by pursuing or pursuit in a jury instruction charging a violation of K.S.A. 2021 Supp. 8-1568. That statute defines the crime of fleeing or attempting to elude a police officer as including fleeing or attempting to "elude a pursuing police vehicle or police bicycle, when given visual or audible signal to bring the vehicle to a stop" if the driver "[c]ommits any of the following during a police pursuit." K.S.A. 2021 Supp. 8-1568(b)(1).

Ervin requested that pursuit be defined as "the act of chasing to overtake or apprehend. Following is not chasing to overtake or apprehend. If the officer turned the emergency lights and siren off, he was not in pursuit when the motor vehicle accident occurred." Ervin partially based the definition on language in *State v. Escobar*, No. 112,538, 2016 WL 3144179 (Kan. App. 2016) (unpublished opinion), which noted that Black's Law Dictionary defines pursuit as "'[t]he act of chasing to overtake or apprehend.'" 2016 WL 3144179, at *3 (quoting Black's Law Dictionary 1432 [10th ed. 2014]). The district judge addressed Ervin's request to define pursuit but rejected it, determining the definition was unnecessary.

On appeal, Ervin acknowledges that common terms do not necessarily require definition. As stated in a case cited by the State, "a trial court 'need not define every word or phrase in the instructions. It is only when the instructions as a whole would mislead the jury, or cause them to speculate, that additional terms should be defined.'" *State v. Armstrong*, 299 Kan. 405, 440, 324 P.3d 1052 (2014) (quoting *State v. Norris*, 226 Kan. 90, 95, 595 P.2d 1110 [1979]). We have also held that widely used and readily understood terms need not be defined in jury instructions. This general rule correlates with the rule that the Legislature intends for a word to be used in its "ordinary,

15

contemporary, and common meaning" unless it provides an alternative definition. *State v. Hambright*, 318 Kan. 603, 608, 545 P.3d 605 (2024) (quoting *Midwest Crane & Rigging, LLC v. Kansas Corporation Comm'n*, 306 Kan. 845, 851, 397 P.3d 1205 [2017]). And juries may apply their understanding of common, ordinary words to evaluate the evidence before them. 318 Kan. at 607.

Ervin nevertheless argues a definition was necessary here because of evidence that the two pursuing officers ended their pursuit before the collision in the intersection occurred. We disagree. This argument conflates the elements of fleeing or attempting to elude with the elements of felony murder. The two charges are distinct, and we are now focused on the elements of fleeing or attempting to elude a police officer. In discussing the next issue, we will address Ervin's arguments about how timing impacts his felony murder conviction.

Even so, Ervin correctly points out that timing is an inherent part of a charge of fleeing or attempting to elude a police officer. Ervin was charged under K.S.A. 8-1568(b)(1)(C), which required the jury to find that he engaged in reckless driving "during a police pursuit." As he suggests, the jury must limit its consideration to his driving during the pursuit and may not look at his actions after the pursuit ended. That does not mean the judge needed to define pursuit, however.

The jury instruction in Ervin's trial used the statutory language "during a police pursuit." And this point was emphasized by both sides during closing arguments. The State made clear that the reckless acts considered under the fleeing or attempting to elude count must have occurred while police car lights and sirens were activated. The State detailed the actions it argued supported the conclusion that Ervin recklessly drove during that time. The prosecutor pointed out that Ervin drove over a curb and sidewalk and went off road. Once on the road, he spun donuts, he lost a fender, and he drove at highway speeds on a major city street during rush hour traffic. The State argued that at that

16

point—before the officers ended their pursuit and before Ervin collided with other cars—Ervin had "completed [the] crime of flee and elude."

Ervin nevertheless insists it would have been legally appropriate to give the definition of pursuit from Black's Law Dictionary quoted by the Court of Appeals in *Escobar*, 2016 WL 3144179, at *3. While quoting the definition may have been legally appropriate, nothing in *Escobar* suggests a fleeing or eluding instruction without a definition of pursuit is not legally appropriate. For example, *Escobar* does not suggest the term is confusing or used in a way that deviates from its ordinary, contemporary, and common meaning. Our review reveals that the Black's Law definition quoted in *Escobar* is consistent with lay dictionary definitions of the term. See "Pursuit." American Heritage Dictionary (ahdictionary.com); "Pursuing." American Heritage Dictionary (ahdictionary.com); "Pursuit." Merriam-Webster.com Dictionary; "Pursuing." Merriam-Webster.com Dictionary.

Moreover, Ervin's proposed language did much more than simply define pursuit. He added points to bolster his position by suggesting the instruction should read: "Following is not chasing to overtake or apprehend. If the officer turned the emergency lights and siren off, he was not in pursuit when the motor vehicle accident occurred." Had the district judge adopted Ervin's proposed instruction, the State could have argued it was erroneous because instructions should fairly and accurately represent the law without unduly emphasizing any one aspect of a party's case. *Koser v. Atchison, Topeka & Santa Fe Ry. Co.*, 261 Kan. 46, 51, 928 P.2d 85 (1996) ("A court should not by its instructions unduly emphasize one aspect of the case." [quoting *Guillan v. Watts*, 249 Kan. 606, 617, 822 P.2d 582 (1991)]).

For all these reasons, we conclude the district judge did not err when he refused to include Ervin's requested definition of pursuit.

ISSUE 5:  SUFFICIENT EVIDENCE SUPPORTED ERVIN'S CONVICTION FOR FELONY MURDER

Ervin also challenges the sufficiency of the evidence supporting his conviction for felony murder, relying heavily on the fact the crime of fleeing or attempting to elude a police officer was a completed crime before the collision that caused Samantha Russell's death. In considering this argument, we begin with the statutory definition of the crime. Felony murder "is the killing of a human being committed . . . in the commission of, attempt to commit, or flight from any inherently dangerous felony." K.S.A. 21-5402(a)(2). Here, the State charged Ervin with the inherently dangerous felony of reckless driving during a police pursuit in which the "driver of a motor vehicle . . . knowingly fails or refuses to bring such driver's vehicle to a stop, or who otherwise flees or attempts to elude a pursuing police vehicle or police bicycle, when given visual or audible signal to bring the vehicle to a stop." K.S.A. 8-1568(b)(1). See K.S.A. 21-5402(c)(1)(R) (including violations of K.S.A. 8-1568[b] in definition of inherently dangerous felony for purposes of felony murder).

The essence of Ervin's argument is that Russell's killing occurred after the officers had ended their pursuit of Ervin and after he completed the crime of fleeing or attempting to elude a police officer. As we have discussed, the State's theory of the case was that Ervin completed the crime of fleeing or attempting to elude before the collision that resulted in Samantha Russell's death. On this point, the parties agree. But they disagree about the significance of having a completed crime and about whether having a completed crime before the collision means the State failed to meet its burden of presenting sufficient evidence of felony murder.

We must review this challenge to the sufficiency of the evidence "'in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt.'" Appellate courts "do not reweigh evidence,

18

resolve evidentiary conflicts, or weigh witness credibility." *Hambright*, 318 Kan. at 607 (quoting *State v. Buchanan*, 317 Kan. 443, 454, 531 P.3d 1198 [2023]).

In applying that standard here, we focus on two requirements of proving felony murder. First, the death must occur within the res gestae of the underlying inherently dangerous felony. Res gestae is "defined in this context as acts committed before, during, or after the happening of the principal occurrence, when those acts are so closely connected with the principal occurrence as to form, in reality, a part of the occurrence." *State v. Cameron*, 300 Kan. 384, 396, 329 P.3d 1158 (2014). Thus, the death need not occur during the commission of the inherently dangerous felony to support a conviction for felony murder. The inherently dangerous felony may also occur before or after death if it is so connected by time, distance, and causal connection as to be part of the principal occurrence. *State v. Jacques*, 270 Kan. 173, 189-90, 14 P.3d 409 (2000).

Second, proof of a sufficient causal connection depends on proving a direct causal link between the inherently dangerous felony and the killing. An extraordinary intervening event, for example, may supersede the felonious act and be the legal cause of the death. *Cameron*, 300 Kan. at 396-97. Whether an event is an extraordinary intervening event turns on whether the event was foreseeable. *State v. Nesbitt*, 308 Kan. 45, 53, 417 P.3d 1058 (2018).

Ervin first argues the end of the police pursuit broke the causal chain between the alleged fleeing or attempting to elude the officers and the collision that killed Russell. He attempts to stretch the panel's analysis in *Escobar* to apply here. But *Escobar* is not comparable for two reasons.

First, *Escobar* involved a different provision of K.S.A. 8-1568, specifically subpart (b)(1)(D), which requires the State to prove the defendant was in an accident or intentionally caused damage to property. Thus, to prove the fleeing or attempting to elude

19

charge the State had to present evidence that Eduardo Escobar was in an accident during a police pursuit. In contrast, here the State did not have to prove that Ervin was in an accident during the police pursuit because the State charged Ervin under a different subsection of K.S.A. 8-1568. Specifically, the State charged and had to prove that Ervin drove "in willful or wanton disregard for the safety of persons or property" during the pursuit. See K.S.A. 8-1566(a). As we discussed in the previous issue, the State argued that theory to the jury and took the position the reckless driving occurred during the pursuit. Its theory was consistent with the *Escobar* panel's focus on the requirement that the charged acts of the underlying driving offense must occur during the pursuit. See 2016 WL 3144179, at *3-5.

Second, *Escobar* is distinguishable because it did not apply the felony murder statute. As we have noted, the felony murder statute allows the jury to consider events occurring before and after the charged felony to determine whether the killing meets the elements of felony murder. *Escobar* offers no insight on the question before us.

Ervin also argues the State did not prove causation. He asserts it necessarily follows that there was a break in causation because of the time between when the police stopped pursuing him and when the accident occurred and because of the distance he covered after the pursuit ended. He points to the testimony of one of the officers who told the jury that he stopped his pursuit at a different intersection than the one where the fatal collision occurred and that he had lost sight of Ervin's truck before the collision.

Ervin's argument minimizes several circumstances and effectively asks us to consider the evidence in the light most favorable to him. But we must consider the evidence in the light most favorable to the State. *Hambright*, 318 Kan. at 607. One of the circumstances he minimizes is that, although Ervin's driving at high speeds created distance between himself and the officers and the officers did not reach the intersection of the fatal crash, he remained on the same street and continued to move away from the

20

officers and the convenience store. Plus, the difference in distance and the passage of time were not significant. One of the officers said he had turned around just one intersection before where the collision occurred because it was his first opportunity to safely do so after turning off his lights. And the collision occurred within just three to four minutes of when an officer first instructed Ervin to shut off the truck at the convenience store. During that entire time, Ervin kept driving away from the convenience store and the police officers at high rates of speed and in heavy traffic until he finally crashed. Even after the collisions disabled the truck, he continued to flee on foot. Ample evidence supports the jury concluding that the collision that killed Russell was part of an unbroken causal chain set in motion by Ervin's decision to flee.

Ervin also suggests the truck running the red light broke the chain of causation. He cites *Nesbitt*, 308 Kan. 45, Syl. ¶ 3, and argues it was not foreseeable that the truck would run a red light. Ervin unsuccessfully attempts to disassociate his actions from the truck's movements. His argument also unsuccessfully rests on assumptions that Ervin knew the pursuit had ended and that he had adjusted his driving accordingly. He points to no evidence supporting these assumptions, and our review of the record shows all evidence points the other way. Surveillance video along the route shows the truck travelling at high speed and running over or hitting curbs along the path, causing damage to three cars and fatally injuring one's driver before coming to rest on its side with a missing rear axle. The car never shows any sign of slowing down until the forces of the collisions stop it. Even after his truck was immobile, Ervin continued his flight on foot. These circumstances suggest it was foreseeable that Ervin would run a red light.

In short, the evidence presented, viewed in the light most favorable to the State, supports a rational fact-finder concluding beyond a reasonable doubt that Ervin committed felony murder.

ISSUE 6:  NO ERROR IN LISTING GUILTY FIRST ON VERDICT FORM

Ervin requested the district court place the option of finding Ervin not guilty before the option of finding him guilty on the verdict forms. He argues on appeal the district court erred in not doing so because placing guilty first violates the presumption of innocence. Ervin acknowledges precedent against him, citing *State v. Fraire*, 312 Kan. 786, 795-96, 481 P.3d 129 (2021), and earlier cases *Fraire* relied on. He asks this court to revisit and reverse that line of cases. We decline to do so.

We recently rejected a similar request from another defendant in *State v. Dotson*, 319 Kan. 32, 52, 551 P.3d 1272 (2024), and Ervin, like the defendants in *Dotson* and *Fraire*, "'makes no showing at all that the order in which the verdict form presents the options has any bearing on the likelihood of a jury reaching one verdict or the other.'" 319 Kan. at 52 (quoting *Fraire*, 312 Kan. at 796). We reaffirm our precedent and conclude the verdict form here presented no error of law.

ISSUE 7:  NO ERRORS TO ACCUMULATE

Ervin also argues that the cumulative effect of errors denied him his constitutional right to a fair trial. But Ervin established no errors, and thus the cumulative error doctrine cannot apply. *State v. Showalter*, 318 Kan. 338, 364, 543 P.3d 508 (2024). Because we do not apply the doctrine, we also do not reach Ervin's arguments about the appropriate test to be applied and his request that we reconsider or distinguish *Waldschmidt*, 318 Kan. 633, Syl. ¶ 9.

We thus affirm Ervin's convictions.

22

ISSUE 8:  THE DISTRICT COURT ERRED IN CALCULATING ERVIN'S JAIL-TIME CREDIT

Finally, Ervin raises an issue about his sentence, arguing that the district judge erred when he refused to award Ervin jail time credit for 346 days of his incarceration. At sentencing, the district judge imposed a total sentence of life in prison with parole eligibility after 724 months in prison. He ordered that the sentences in this case would run "consecutively to all other cases." The judge asked about jail credit and the prosecutor explained, "Judge, as of today's date, since you ran this case consecutive, we are looking at—at zero days credit, as it's all gone to his previous case of 20 CR 2496." After more discussion, the prosecutor stated that Ervin was entitled to 239 days. The judge asked Ervin's counsel if he objected, and counsel responded by saying, "No, sir. We did review the journal entry on the other case, the 20 CR 2496, and we would agree with that."

The journal entry of judgment reflects a different jail credit calculation, however. It shows that Ervin spent 749 days in jail pending judgment, and it divides that time into two parts. The first part covers Ervin's incarceration from his arrest on July 7, 2021, until June 17, 2022, a period of 346 days. It then calculates the days from June 18, 2022, to July 26, 2023, the date of the sentencing hearing. This period included 403 days. It showed that Ervin was given credit for 403 days and had a sentence begin date of June 18, 2022. The journal entry explained:

> "During this case, defendant was also held in custody on 20CR2496. Although KDOC will provide a final determination of the incarceration credit in 20CR2496, defendant appears to have served the balance of his sentence in that case no later than 06/17/22. Any duplicate incarceration credit after 06/17/22 has been awarded to 21CR1350. As this case is [c]onsecutive to any other prior cases, defendant is not eligible for duplicate credit for any time awarded by KDOC to 20CR2496 in 21CR1350[, which is this case]."

Ervin's counsel approved this journal entry.

23

On appeal, Ervin takes a different position, arguing the judge's failure to allow a credit for all of Ervin's time in jail (the 346 days not credited plus the 403 days credited) is contrary to K.S.A. 21-6615(a) and *State v. Hopkins*, 317 Kan. 652, 537 P.3d 845 (2023). The State, however, contends the judge's order is not contrary to the statute and that *Hopkins* does not answer the question of how to apply jail credit when duplicate credit would be awarded in two cases where the sentences in one case are consecutive to those in another case.

*Preservation*

Before discussing that argument, we need to consider preservation. Ervin acknowledges that he did not object at the hearing or to the journal entry of judgment. He also concedes that issues not raised in the district court generally will not be considered on appeal. Instead, he contends two preservation exceptions apply: (1) the issue involves a question of law on admitted facts and (2) consideration is necessary to prevent the denial of his fundamental right to liberty. For support he cites *Trotter v. State*, 288 Kan. 112, 125, 200 P.3d 1236 (2009) (identifying three preservation exceptions), and *State v. Ward*, No. 125,421, 2023 WL 7404186, at * 4 (Kan. App. 2023) (unpublished opinion) (consideration of unpreserved jail time credit necessary to prevent denial of fundamental right to liberty). The State does not argue against our applying these exceptions. Instead, it argues the merits and contends Ervin has no right to claim additional jail-time credit because Ervin was held on multiple cases and the sentences in this case do not begin to run until after Ervin has served his sentences in the other case.

We agree with Ervin's argument that an exception to the preservation requirement applies because Ervin presents a question of law involving interpretation of a statute that is presented on admitted facts. See *In re Wrongful Conviction of Spangler*, 318 Kan. 697, 701, 547 P.3d 516 (2024) (statutory interpretation is question of law). We thus will

24

address Ervin's claim, and we turn to the merits of his argument that he is entitled to a credit for all days he was in jail pending resolution of this case.

*K.S.A. 21-6615(a)*

To do so, we must interpret K.S.A. 21-6615(a). When interpreting statutes, "[w]e follow the express language used when it is plain and unambiguous, giving common words their ordinary meanings, without adding to or subtracting from the text." *American Warrior, Inc. v. Board of Finney County Comm'rs*, 319 Kan. 78, 81, 552 P.3d 1219 (2024).

K.S.A. 21-6615(a), as worded when Ervin was sentenced, directed courts to credit a defendant with "an allowance for the time which the defendant has spent incarcerated pending the disposition of the defendant's case." In full, the provision stated:

> "In any criminal action in which the defendant is convicted, the judge, if the judge sentences the defendant to confinement, shall direct that for the purpose of computing defendant's sentence and parole eligibility and conditional release dates thereunder, that such sentence is to be computed from a date, to be specifically designated by the court in the sentencing order of the journal entry of judgment. Such date shall be established to reflect and shall be computed as an allowance for the time which the defendant has spent incarcerated pending the disposition of the defendant's case."

We recently interpreted this statute in *Hopkins*, 317 Kan. 652. There, Mark Hopkins II faced various charges in different cases. All told, he spent 572 days in jail awaiting disposition of the various matters. Hopkins eventually pleaded guilty to two premeditated first-degree murder counts in one case; the State withdrew a motion to revoke probation in another case and other pending cases against him were dismissed. In the sole remaining case, the district court imposed two concurrent lifetime sentences

25

without possibility of parole for 50 years but declined to award any jail-time credit under precedent interpreting the jail-time credit statute to allow credit only when a defendant is being held solely on the crime charged.

In considering Hopkins' contention that he should have received jail-time credit, we cited *Campbell v. State*, 223 Kan. 528, Syl. ¶ 2, 575 P.2d 524 (1978), and acknowledged that since its filing in "1978 we have held that the language in K.S.A. 2022 Supp. 21-6615(a) requires the sentencing judge to award a defendant credit for all time spent in custody 'solely' on the charge for which the defendant is being sentenced while awaiting disposition of his or her case, and that a defendant is not entitled to credit for time '"which he has spent in jail upon other, distinct, and wholly unrelated charges."'" 317 Kan. at 655 (quoting *State v. Smith*, 309 Kan. 977, 981, 441 P.3d 1041 [2019]; *Campbell*, 223 Kan. 528, Syl. ¶ 2). But we concluded that "the statute does not say that." *Hopkins*, 317 Kan. at 656. After reviewing the plain language of the statute, we held "a defendant shall be awarded jail time credit for *all* time spent in custody pending the disposition of his or her case." 317 Kan. at 657. This "updated rule is a much easier endeavor; we simply conclude that because Hopkins spent 572 days in jail while his case was pending, Hopkins must be awarded 572 days in jail time credit." 317 Kan. at 659.

Ervin contends that holding means he is entitled to a credit for the remaining 346 days he was in jail so that he receives credit for *all* days he was held, even though he was also held on charges in an unrelated case and received credit on his sentence in that unrelated case. He accurately notes that *Hopkins* did not limit the holding to sentences involving single cases or concurrent sentences. He views the *Hopkins* holding as being broad enough to require credit for *all* days in *all* cases, even if doing so results in jail credit for the same days in multiple cases—that is duplicate credit. The State counters that *Hopkins* is distinguishable because of its facts and that it should not be read to broadly cover more complex situations with multiple cases and consecutive sentences. It also argues that *Hopkins* has proved unworkable in more complex cases, and it cites *State*

26

*v. Feikert*, 64 Kan. App. 2d 503, 553 P.3d 344 (2024), and *State v. Breese*, No. 125,837, 2023 WL 8520792 (Kan. App. 2023) (unpublished opinion), to illustrate that point and to support its position that Ervin should not receive credit for the remaining 346 days.

The *Feikert* Court of Appeals panel considered the same arguments as Ervin now makes about the application of *Hopkins* in a situation where Blake Feikert was sentenced in multiple cases to consecutive sentences. The panel declined to read *Hopkins* broadly and concluded *Hopkins* provides "scant guidance as to how [its] simplified rule should be applied in more complicated instances." 64 Kan. App. 2d at 506. The *Feikert* panel also noted that Court of Appeals judges applying *Hopkins* have disagreed about how jail-time credit should be awarded when multiple cases are involved. 64 Kan. App. 2d at 503-04 (comparing *State v. Gutierrez*, No. 125,073, 2024 WL 1338948, at *3 [Kan. App. 2024] [unpublished opinion] [Malone, J., concurring], with *State v. Ward*, No. 125,421, 2023 WL 7404186, at *5 [Kan. App. 2023] [unpublished opinion]).

The *Feikert* panel observed that the divergence of opinion reflected that "*Hopkins* does not articulate a clear method for determining jail credit in multiple cases where consecutive sentences are imposed." 64 Kan. App. 2d at 507. But the panel determined that "other caselaw helps fill this gap." 64 Kan. App. 2d at 508. It discussed both *State v. Lofton*, 272 Kan. 216, 32 P.3d 711 (2001), and *State v. Davis*, 312 Kan. 259, 474 P.3d 722 (2020). 64 Kan. App. 2d at 508-09.

Jackie Lofton sought jail-time credit awarded against two felonies, in effect increasing the jail-time credit he would receive to twice the time he served. The *Lofton* court rejected his argument, stating that K.S.A. 21-4614, the identical predecessor to K.S.A. 21-6615, "contains no provision for credit in excess of the time an individual is actually incarcerated in jail." 272 Kan. at 217-18. The *Feikert* panel characterized *Lofton* as establishing "a common-sense rule that a defendant should receive one day of credit—

27

not multiple days—toward a controlling prison sentence for every day spent in jail." 64 Kan. App. 2d at 508.

In the second case the *Feikert* panel cited for support, Alex Dee Davis attacked his sentence for failing to include 599 days of jail-time credit. The *Davis* court pointed to *Lofton*'s conclusion and likewise concluded no jail credit may be awarded against a sentence in one case that has already been used against a sentence in another case. Applying that rule, the court found no error in the district court's decision not to award the 599 days in the case on appeal when the record indicated those days were awarded in another case. 312 Kan. at 287-88.

The *Feikert* panel said, "Nothing in *Hopkins* suggests that the Kansas Supreme Court intended that decision to modify *Davis*' rule that prohibits duplicative credit in instances where a defendant receives consecutive sentences in multiple cases." 64 Kan. App. 2d at 509. Contrary to this conclusion, *Hopkins* overruled one of the legal standards underpinning *Davis*—the rule that "credit in a case is given for time spent in custody 'solely on the charge.'" 312 Kan. at 287.

As in *Hopkins*, we return to the statutory language to discern legislative intent. See 317 Kan. at 657. The Legislature stated: "Such date shall be established to reflect and shall be computed as an allowance for the time which the defendant has spent incarcerated pending the disposition of *the defendant's case*." (Emphasis added.) K.S.A. 21-6615(a). The statute does not say the credit should only be applied when the credit does not duplicate an allowance in another case. A fundamental rule of statutory interpretation is that we do not add words to those written by the Legislature. *American Warrior, Inc.*, 319 Kan. at 81. And we decline to do so here where the statute directs judges to allow a credit for the time a defendant spends incarcerated pending disposition of the case.

28

The *Feikert* panel justified the implied statutory modification adopted in *Lofton* and *Davis* by applying a rule of statutory construction that allows courts to construe statutes to avoid unreasonable or absurd results. 64 Kan. App. 2d at 509. The panel concluded a rule that permitted "duplicative credit for time spent in jail awaiting disposition of criminal charges against multiple cases . . . would defy common sense, as it would grant a windfall to defendants who commit multiple offenses in separate cases." 64 Kan. App. 2d at 509. We disagree with the panel for several reasons.

First, we disagree that it is appropriate to apply this rule of statutory construction. Rules of statutory construction, including the rule about avoiding unreasonable or absurd results, apply only when "the language of the statute is unclear or ambiguous." *State v. Arnett*, 307 Kan. 648, 653, 413 P.3d 787 (2018). K.S.A. 21-6615(a) is clear.

Second, applying the plain language of K.S.A. 21-6615(a) does not necessarily lead to an absurd result. The Legislature may have had any number of reasons for allowing days spent in custody to be credited in each pending case. One may be the simplicity of calculation and application of the rule of crediting all days to the case before the judge for sentencing. See *Hopkins*, 317 Kan. at 657-59. The confusion in this case at sentencing and the later reformation of the calculation in the journal entry illustrate the confusion caused by the *Campbell/Lofton/Davis* rule. The Legislature might also have wanted to motivate the State to expeditiously bring the defendant to trial. While the *Feikert* panel, the prosecutor, or others might make a different policy decision, the choice is one entrusted to the Legislature. Our role is to interpret the plain language of the Legislature to effectuate its intent, not substitute our policy determinations. See *Jarvis v. Kansas Dept. of Revenue*, 312 Kan. 156, 170, 473 P.3d 869 (2020).

The State also relies heavily on policy arguments, some of which are grounded in procedures and administrative regulations that rest on *Lofton* and *Davis*. It criticizes the panel of the Court of Appeals in *Breese*, 2023 WL 8520792, for applying *Hopkins* and, in

doing so, "strip[ping] district courts and parties of their ability to assist" the Kansas Department of Corrections (KDOC). The State observed that "[h]istorically, the parties and district courts were able to help clarify jail credit calculations in complex cases by providing explanations for the Kansas Department of Corrections (KDOC), which is required to calculate and apply jail credit under K.A.R. 44-6-134, including in complex scenarios involving multiple consecutive sentences." But the State does not explain what additional guidance is needed post-*Hopkins* beyond the sentencing judge announcing the number of days of credit and a sentence begin date. The additional guidance the State would provide KDOC is often necessary only because of the rule developed in *Campbell* that requires allocating jail credit between cases. Separate cases often require courts and KDOC to consider different dates that mark the beginning of incarceration and different dates that mark the date of sentencing. Under *Hopkins*, those considerations and multiple dates do not clutter or complicate the straightforward calculation provided for in the statute.

Finally, we note that the Legislature acted expeditiously to amend the statute following *Hopkins*. See L. 2024, ch. 96, §§ 7, 13. We mention this to clarify that our focus is on the language of K.S.A. 21-6615. The State does not ask us to apply the 2024 amendments retroactively, and we leave for another day any questions about whether the amendments are retroactive or about application of the amended statute.

In short, we agree with Ervin that the language of K.S.A. 21-6615 required a district court to award an allowance for all time spent incarcerated "pending the disposition of *the* defendant's case." (Emphasis added.) This language required the district judge to award one day of credit for each day that Ervin was incarcerated pending disposition of this case regardless of whether he received an allowance for some or all that time against a sentence in another case.

30

We note that the calculation of the number of days Ervin spent in jail before sentencing is not disputed. It thus does not appear a hearing is necessary. We, therefore, remand this case to the district court with directions to enter an amended journal entry of judgment crediting Ervin with all days he was incarcerated pending disposition of his case. But we hesitate to make our order about remand proceedings too restrictive because of the confusion at the sentencing hearing and the difference between the calculation at sentencing and that in the journal entry. Given the confusion, a hearing may be necessary. Consequently, we leave open the option for the district judge to hold a hearing if necessary.

### CONCLUSION

We affirm Ervin's convictions, holding that no trial error supports reversing any of them. We, however, do find error in the district judge's failure to award jail time credit for all days Ervin spent in custody pending the disposition of his case. See *Hopkins*, 317 Kan. at 657. We therefore vacate the district court's determination of jail time credit and remand for entry of an amended journal entry of judgment crediting Ervin with all days he was incarcerated pending disposition of his case, or for a hearing if necessary.

Affirmed in part, vacated in part, and remanded with directions.