NOT DESIGNATED FOR PUBLICATION

No. 126,745

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

RAYMUNDO I. AGUILAR,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; DAVID KAUFMAN, judge. Submitted without oral argument. Opinion filed March 20, 2026. Convictions affirmed, sentences vacated in part, and case remanded with directions.

*Sam Schirer*, of Capital Appeals and Conflicts Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before HILL, P.J., PICKERING and BOLTON FLEMING, JJ.

PICKERING, J.:  Raymundo I. Aguilar appeals his convictions in multiple Sedgwick County cases. On appeal, he asserts the district court denied him his constitutional right to counsel, failed to investigate his claims of ineffective assistance of counsel at sentencing, failed to order the appropriate jail credit, and erred in assessing certain fees. After a careful review, we affirm his convictions, vacate his sentences in part, and remand to the district court to consider Aguilar's ineffective assistance of counsel motions and for resentencing regarding jail credit.

1

In 19-CR-3009, the State charged Aguilar with rape, aggravated indecent solicitation of a child, and possession of marijuana. In 19-CR-3328, the State charged Aguilar with aggravated intimidation of a witness and four counts of violation of a protective order. In 19-CR-3330, the State charged Aguilar with rape, aggravated criminal sodomy, and aggravated indecent liberties with a child. Finally, in 20-CR-1209, the State charged him with a single count of rape. A jury convicted Aguilar on all charges in February 2023.

Based on the issues before us, there are only two relevant hearings: a hearing on Aguilar's motion for the appointment of new counsel or, in the alternative, to proceed pro se and the sentencing hearing. As a result, a lengthy recitation of the trial facts is unnecessary.

*Motion for Appointment of New Counsel Hearing*

Before trial, Aguilar filed a motion in May 2022 for appointment of new counsel or in the alternative to proceed pro se because his previous appointed counsel had stopped working for the public defender's office. The district court heard Aguilar's motion in July 2022. At the hearing, the district court informed Aguilar that the public defender's office still represented him. Aguilar told the court he still wished to proceed pro se because there were motions he wanted to file and he was not sure the motions "would have been adopted or not." The district court replied that Aguilar wanted to represent himself "because your attorney's been practicing law for 34 years, won't bring some of your pro se motions before me because he doesn't think they have any merit, and so you want to represent yourself and have me deal with all your pro se motions." The district court again asked if Aguilar wanted to proceed pro se; Aguilar confirmed he wanted to represent himself and understood the significance of that decision.

The district court continued:

"This is just a game, because you have no intention whatsoever, as you look me in the eye, on trying this case yourself on February 23rd. You have no idea how to try the case. You know damn good and well you're not going to, you just want to go, quote, 'pro se,' so I will hear your motions. And I've looked at your motions, and trust me, I will rule on them, and then as soon as your motions are resolved, and assuming they're denied, you're going to come back to court and say 'I'd like [Aguilar's appointed counsel] to represent me again.' That's not the game we're playing here. You're going all in yourself or you're going to have [his appointed counsel]. So, you understand that?"

Later in the hearing, the district court returned to the "game" analogy, stating:

"We're not playing this game where you get to switch and change the rules because you're going to come back in, late this year or early January, and say 'Judge Kaufman, I realize I can't do this case myself and I want you to appoint counsel,' and you know something, the Supreme Court of Kansas will say 'Well, he asked it before trial, Judge Kaufman, why would you say no?'"

The district court answered its rhetorical question, stating that it had 65 trials scheduled between the July 2022 hearing and the February 2023 trial date. The court then asked, "So, you ready to tee it up on your own, brother? You ready to go? Because I won't violate your rights, but I am not playing games." The district court again pontificated:

"[A]ll the motions that are generally filed by pro ses are trash. You may be the exception. But, are you ready to go represent yourself? Because you are in the big leagues now. Are you ready? Are you sure you want to—I'm not trying to dissuade you, it's just I have no tolerance anymore. And I don't give a damn what the appellate courts say anymore because they do not respect this process."

3

After questioning Aguilar about his education and quizzing Aguilar on the law, the district court again asked what Aguilar wanted to do. Aguilar replied that he wanted to proceed pro se. The district court asked if Aguilar was "clearly" and "unequivocally" asking to proceed pro se, and Aguilar confirmed he was.

The district court advised Aguilar that he could change his mind at any time and hire an attorney to represent him. It then advised Aguilar he could ask the court to appoint an attorney for him, though that did not mean the court would necessarily grant Aguilar's request. The court asked if Aguilar understood he had the right to change his mind; Aguilar replied that he understood and he understood the court had discretion over whether to appoint him new counsel. The district court then advised that the trial would not be postponed based on a request for counsel. Aguilar indicated he understood.

The district court continued:

"If you haven't gotten the vibe from me now based on what I've said, you're going to understand it explicitly. It's detrimental in my opinion and the entire court system's opinion for you not to have an attorney represent you. 'Detrimental' means it is a bad idea. But, your life, your choice. You understand it's a bad idea to represent yourself? I'm required to tell you that. You may disagree with that. I'm required to tell you that. So, you understand that the courts think that it's a bad idea to represent yourself?"

Aguilar responded, "I do understand."

The district court explained Aguilar had to follow all the "rules, laws, statutes, decorum, protocol as relates to any hearing or trial . . . ." It stated that there could be numerous pretrial motions "of a technical nature" that Aguilar may lose the advantage of using if he chose to represent himself. It advised it would make no objections for Aguilar and that the prosecutor was not required to help him. The district court explained Aguilar may inadvertently waive statutory or common law rights and stated that, since Aguilar

4

was in custody, "it can be difficult . . . to locate witnesses, interview them, prepare subpoenas and have them served." Aguilar indicated he understood.

Finally, the district court advised Aguilar of the maximum sentence he could be sentenced to if convicted. The district court concluded, "[T]he point is if convicted as charged, you die in prison." Aguilar announced he understood. The district court then asked if Aguilar had any questions for the court; he did not. The court asked a final time if Aguilar still wanted to represent himself "after all dangers and disadvantages of self-representations have been explained." Aguilar replied, "Yes, Your Honor."

After he was convicted, Aguilar moved to withdraw his pro se status and have counsel appointed to represent him. The district court appointed counsel for Aguilar. On May 30, 2023, Aguilar filed a motion for ineffective assistance of posttrial counsel. Aguilar filed a second motion alleging ineffective assistance of counsel on June 16, 2023.

*Sentencing*

Sentencing occurred on June 23, 2023. Aguilar's counsel asked whether the district court wanted to address Aguilar's ineffective assistance of counsel motions. The district court replied, "They're not timely filed. I'll make a record on those motions that aren't timely filed." After ruling on Aguilar's numerous pro se posttrial pleadings, the district court proceeded to sentencing. During allocution, Aguilar stated:

> "Also, I would like to object to the Court's not going into inquiry about my ineffective counsel claims against my counsel and abusing the discretion of allowing counsel to argue motions on my behalf without going into the ineffective counsel claims. There's been a number—two motions of claims against my counsel . . . and showing a complete conflict of interest and the Court has completely disregarded it and disposed of it."

5

The district court replied, "It's because there's no merit. And this is allocution; we're not talking about post-trial motions. . . . I'm not going back to that. . . . This is not a debate, this is an opportunity to speak on mitigation of the sentence."

Ultimately, the district court sentenced Aguilar to lifetime imprisonment for each count of rape and aggravated criminal sodomy. It also sentenced Aguilar to 114 months' imprisonment for his grid sentences, and 4 years in jail for the misdemeanor convictions. It ran every sentence consecutive except for the possession of marijuana conviction, which it ran concurrent with the other misdemeanor convictions' sentences. During its recitation of the sentence, the district court stated, "Court costs are assessed per statute." After the court finished pronouncing the sentence, the prosecutor asked, "Sir, did you order the $725 SANE/SART fees?" The district court responded that "[i]t's a court cost, so I just ordered all statutory court costs."

The journal entry of sentencing for 19-CR-3009 reflects that Aguilar was ordered to pay $40 in witness fees, a $725 Sexual Assault Kit/Exam fee, $800 in Children's Advocacy Center Assessment fees, and $55.28 in mileage fees. The journal entry of sentencing for 19-CR-3330 assessed witness fees of $60, a $725 Sexual Assault Kit/Exam fee, $1,200 in Children's Advocacy Center Assessment fees, and $413.08 in mileage fees. In 20-CR-1209, the journal entry of sentencing shows the district court assessed $60 in witness fees, a $725 Sexual Assault Kit/Exam fee, and a $400 Children's Advocacy Center Assessment fee. In total, the district court ordered Aguilar to pay $2,400 in Children's Advocacy Center Assessment fees and $2,175 in SANE/SART fees. The district court also ordered Aguilar to pay a total of $160 in witness fees and $468.36 in mileage.

Aguilar timely appealed.

ANALYSIS

I.    *The District Court Did Not Violate Aguilar's Constitutional Right to Counsel*

*Preservation*

Aguilar argues that he had no opportunity to object to a judicial ruling because he was not correctly advised by the district court. Citing K.S.A. 60-246, he suggests that this argument preserves the issue for appeal. But this misses the mark. K.S.A. 60-246 states, in relevant part:  "A formal exception to a ruling or order is unnecessary. . . . Failing to object does not prejudice a party who had no opportunity to do so when the ruling or order was made." Aguilar had an opportunity to object, even if he did not know the district court's statements were allegedly erroneous. But he did not object.

Constitutional grounds for reversal asserted for the first time on appeal are not properly before us. Even so, the issue can be addressed if it meets an exception to the general rule that a new legal theory cannot be asserted for the first time on appeal. One of these exceptions is that "consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights." *State v. Holley*, 315 Kan. 512, 524, 509 P.3d 542 (2022). And the right to counsel is a fundamental right. *State v. Kemmerly*, 319 Kan. 91, 96, 552 P.3d 1244 (2024). Thus, we will address Aguilar's arguments for the first time on appeal.

*Standard of Review*

"'Waiver of the right to counsel must be knowingly and intelligently made and the determination of such a waiver depends on the particular facts and circumstances of each case.'" 319 Kan. at 93. Thus, we apply "'a bifurcated standard of review, reviewing the district court's fact-findings for substantial competent evidence and the district court's

legal conclusions de novo.'" 319 Kan. at 93. Substantial competent evidence refers to legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion. *State v. Smith*, 312 Kan. 876, 887, 482 P.3d 586 (2021).

*Discussion*

In *State v. Jones*, 290 Kan. 373, 376, 228 P.3d 394 (2010), the Kansas Supreme Court held that a defendant "has the right to represent himself or herself after a knowing and intelligent waiver of his or her right to counsel." To ensure that the defendant's waiver of the right to counsel is knowingly and intelligently made, the district court must inform the defendant of "'the dangers and disadvantages of self-representation.'" 290 Kan. at 376. Although there is no "checklist" required, the Kansas Supreme Court has recommended the district court employ a three-step framework:

> "'First, a court should advise the defendant of the right to counsel and to appointed counsel if indigent. Second, the defendant must possess the intelligence and capacity to appreciate the consequences of his or her decision. And third, the defendant must comprehend the charges and proceedings, punishments, and the facts necessary for a broad understanding of the case.'" *Kemmerly*, 319 Kan. at 97.

On appeal, Aguilar does not complain that he was inadequately informed of his right to counsel or to have counsel appointed. In fact, at the time Aguilar moved to proceed pro se, he had appointed counsel. Nor does Aguilar contend he did not have the "intelligence and capacity to appreciate the consequences" of his decision to proceed pro se. And Aguilar does not argue he did not understand the case.

Instead, Aguilar's appellate counsel asserts that the district court's waiver hearing contained "superfluous commentary" that "misinformed [Aguilar] about the extent to which he retained a right to counsel following the invocation of his right to self-representation." Counsel contends this commentary "must have led [Aguilar] to think that

he, effectively, had no right to counsel once he was within one or two months of his scheduled trial date." Counsel suggests that, had Aguilar "not been misled about his right to counsel, he may have reinvoked that right prior to trial."

For support, Aguilar relies on *United States v. Proctor*, 166 F.3d 396 (1st Cir. 1999). There, Proctor told the court he wished to proceed pro se and the court held a hearing on Proctor's motion. It conducted a colloquy to confirm Proctor understood his right to counsel, the effects of proceeding pro se, and that Proctor understood the charges against him. After advising Proctor the court believed a trained lawyer would be better able to represent him, the court granted Proctor's request to proceed pro se. The court also appointed standby counsel. At a subsequent motions hearing, Proctor said: "Then, at this point, why don't I go ahead and get another lawyer and—because this is just too confusing for me anymore." 166 F.3d at 400. The court informed him it was "too late for that." 166 F.3d at 400.

On appeal, the *Proctor* court wrestled with whether Proctor requested an attorney specifically to argue the motion presently before the court, or whether Proctor requested an attorney for trial. Assuming Proctor simply wanted counsel to argue the motion, the court concluded that it "would have no difficulty in rejecting his Sixth Amendment [to the United States Constitution] claim." 166 F.3d at 403. But if Proctor wanted counsel appointed for the rest of the case, the court found that it was "hard to imagine an explanation for the denial that would withstand scrutiny" because trial was not scheduled for another month "and standby counsel was presumably available to fill the role at that point." 166 F.3d at 403. After concluding there were two possible meanings behind Proctor's request, the court accepted "Proctor's objectively reasonable assertion that he sought to revoke his *Faretta* right to self representation . . . and credit his objectively reasonable claim that he understood the district court's 'it's too late' response to be a rejection of his request." 166 F.3d at 405; see *Faretta v. California*, 422 U.S. 806, 821, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975).

9

*Proctor* is distinguishable for three reasons. First, unlike Proctor, Aguilar never attempted to request reappointment of counsel and the district court did not deny a request for reappointment of counsel. Second, although the district court informed Aguilar it may not appoint him counsel if he requested it as trial approached, Aguilar did not have standby counsel who would be readily available for trial if Aguilar requested counsel shortly before trial. Finally, on appeal, Aguilar does not assert that he understood the district court's colloquy to mean he was not entitled to request reappointment of counsel. Instead, Aguilar's counsel simply alleges the district court's commentary "*must have led* [*Aguilar*] *to think* that he, effectively, had no right to counsel once he was within one or two months of his scheduled trial date" and that "had [Aguilar] not been misled about his right to counsel, he *may have* reinvoked that right prior to trial." (Emphases added.) There is no indication in the record, or in Aguilar's brief, to suggest Aguilar believed he did not have the ability to reinvoke his right to counsel. Further, in December 2022, just two months before trial, Aguilar requested to proceed pro se in an unrelated case.

The district court sufficiently examined Aguilar's desire to proceed pro se. The district court confirmed Aguilar wanted to represent himself and that Aguilar understood the significance of that decision. The district court asked again if Aguilar would like to proceed pro se, advised Aguilar that he could hire an attorney to represent him at any time, and Aguilar could ask the court to appoint an attorney at any time.

The district court then informed Aguilar that it may or may not grant a request for appointed counsel, but Aguilar had the right to change his mind. The district court explained that "no postponement will be permitted at any time because counsel's been brought back in." The court explained it would terminate self-representation and reappoint counsel if Aguilar engaged in "obstructionist misconduct" and advised Aguilar it was detrimental not to have an attorney represent him. The court explained it would not

10

act on Aguilar's behalf and that Aguilar would be held to the same standard as an attorney.

Finally, the district court explained the maximum sentences for each of Aguilar's convictions. The court asked if Aguilar had any questions. After Aguilar confirmed he did not have any questions, the court again asked if Aguilar wanted to represent himself. Aguilar again confirmed he wished to proceed pro se.

The district court's colloquy followed the framework outlined in *Kemmerly* and was enough to determine that Aguilar made a knowing and intelligent waiver of counsel. Further, Aguilar never sought reappointment of counsel. And, on appeal, Aguilar does not affirmatively assert he was misled by the district court's comments. The district court did not violate Aguilar's constitutional right to counsel.

II.    *The District Court Erred When It Did Not Consider Aguilar's Pro Se Motions for Ineffective Assistance of Counsel*

Aguilar argues the district court erred by proceeding directly to sentencing without inquiring about a potential conflict of interest, despite Aguilar's expressed dissatisfaction with his sentencing counsel. The State concedes remand is necessary because the district court failed to inquire about the nature of Aguilar's alleged conflict of interest.

In *State v. Sharkey*, 299 Kan. 87, 96, 322 P.3d 325 (2014), the Kansas Supreme Court held that, once the district court becomes aware of a possible conflict of interest, "'the court has a duty to inquire further.'" Failure to inquire after learning of a potential conflict of interest is an abuse of discretion. 299 Kan. at 97.

Here, the district court did not address either of Aguilar's pro se ineffective assistance of counsel motions, finding the motions were not timely filed. When Aguilar

11

specifically objected to the district court's failure to inquire, the district court responded, "It's because there's no merit. And this is allocution; we're not talking about post-trial motions. You want to say anything in mitigation of the sentence, knock yourself out. I'm not going back to that."

The district court was aware of a potential conflict of interest. And not only did the district court fail to inquire further, it refused to inquire despite Aguilar's objection. The district court abused its discretion. Remand is necessary to address Aguilar's ineffective assistance of counsel motions.

III.     *Aguilar Is Entitled to Jail Credit in Each of His Cases for Each Day He Was Incarcerated Pending Disposition of This Case*

The district court awarded 1,324 days of jail credit in only one of Aguilar's consolidated cases. Aguilar argues that, based on *State v. Hopkins*, 317 Kan. 652, 652, 537 P.3d 845 (2023), he is entitled to a jail credit award in each of his cases.

After the briefs in this case were submitted, the Kansas Supreme Court decided *State v. Ervin*, 320 Kan. 287, 566 P.3d 481 (2025). There, the court held that K.S.A. 21-6615 "required the district judge to award one day of credit for each day that Ervin was incarcerated pending disposition of this case *regardless of whether he received an allowance for some or all that time against a sentence in another case.*" (Emphasis added.) 320 Kan. at 311-12.

Under *Ervin*, Aguilar is entitled to credit in each of his cases for each day he was incarcerated pending disposition of the case. We remand for the district court to recalculate Aguilar's jail credit.

12

IV. *The District Court Did Not Err When It Assessed Children's Advocacy Center Fees*

*Preservation*

Aguilar acknowledges he did not raise this issue before the district court. Generally, an issue not raised before the district court cannot be raised for the first time on appeal. *State v. Green*, 315 Kan. 178, 182, 505 P.3d 377 (2022). There are several exceptions to this rule, including:

> "'(1) [T]he newly asserted claim involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) the claim's consideration is necessary to serve the ends of justice or to prevent the denial of fundamental rights; or (3) the district court's judgment may be upheld on appeal despite its reliance on the wrong ground or reason for its decision.'" *State v. Allen*, 314 Kan. 280, 283, 497 P.3d 566 (2021).

Aguilar asserts he did not have an opportunity to object below because the district court did not announce the fees at sentencing. He further argues that this is a question of law "arising on proved or admitted facts that is finally determinative of the case," so we may review the issue. The State "does not contest [our] ability to review this issue."

*Standard of Review*

Because resolution of this issue requires statutory interpretation, we have unlimited review of the issue. *State v. Daniels*, 319 Kan. 340, 342, 554 P.3d 629 (2024).

*Discussion*

Aguilar argues the district court erred when it assessed him a total of $2,400 in Children's Advocacy Center fees based on his six convictions for crimes in which a minor was the victim. He contends he "should have been assessed only one [Children's Advocacy Center] fee." In contrast, the State asserts the district court assessed the appropriate fees.

K.S.A. 20-370(a) states, in relevant part:  "On and after July 1, 2013, any defendant convicted of a crime under chapter 21 of the Kansas Statutes Annotated, and amendments thereto, in which a minor is a victim, shall pay an assessment fee in the amount of $400 to the clerk of the district court."

The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be ascertained. "An appellate court must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings." *State v. Keys*, 315 Kan. 690, 698, 510 P.3d 706 (2022). Appellate courts do not speculate about the legislative intent behind plain and unambiguous language and should "refrain from reading something into the statute that is not readily found in its words." 315 Kan. at 698.

In *State v. McDuffie*, No. 113,987, 2017 WL 2617648 (Kan. App. 2017) (unpublished opinion), the district court ordered McDuffie to pay a $400 Children's Advocacy Center fee for each of his five convictions in which the victim was a minor. Like Aguilar, on appeal McDuffie argued he should only be required to pay a single assessment despite his multiple convictions for crimes involving a minor.

14

After a lengthy discussion of the meaning of the words "'a'" and "'an,'" the panel determined the statutory language was ambiguous because it could be interpreted two different ways. The statute could create a "one-to-one ratio, where defendants convicted of one crime against a minor are required to pay one fee, but defendants convicted of multiple crimes against minors are required to pay the number of fees equal to the crimes committed against minors." 2017 WL 2617648, at *19. But the panel also recognized the language could be interpreted to require "a defendant convicted of any unspecified number of crimes against minors to pay just one assessment fee." 2017 WL 2617648, at *19. Accordingly, the panel turned to the statute's legislative history.

The panel noted that testimony from committee hearings suggested the purpose of K.S.A. 2016 Supp. 20-370(a) was to punish defendants and raise revenue. And the panel found testimony "strongly indicat[ed] that the legislature intended defendants to pay a fee for each crime they committed against a minor" because the testimony referred to "multiple fees but only a single defendant . . . ." 2017 WL 2617648, at *20. The panel stated that "not ordering that defendants pay a fee per crime committed against a minor undercuts the statute's goal of raising revenue." 2017 WL 2617648, at *20. Based on the legislative history, the panel concluded that K.S.A. 2016 Supp. 20-370(a) required a defendant to pay a Children's Advocacy Center fee for each crime involving a minor that the defendant was convicted of committing. 2017 WL 2617648 at *21.

A different panel addressed this issue in *State v. Sanders*, 65 Kan. App. 2d 236, 563 P.3d 234 (Kan. App.), *rev. denied* 320 Kan. ___ (2025). There, the defendant was convicted of three counts of sexual exploitation of a child and one count of aggravated intimidation of a witness (his minor victim). The district court imposed a $1,600 "'Children's Advocacy Center fee.'" 65 Kan. App. 2d at 240. On appeal, Sanders challenged, among other things, the imposition of four Children's Advocacy Center fees instead of a single $400 fee.

15

While the *McDuffie* panel focused its statutory interpretation on the meaning of the words "a" and "an," the *Sanders* panel focused on the meaning of the words "crime," "charge," and "case." The panel noted: "The issue of whether fees are assessed per charge, per crime, per case or per traffic citation is an issue upon which the Legislature has been consistent and clear." 65 Kan. App. 2d at 261. It looked to Black's Law Dictionary, which "defines a 'crime' as a singular act or '[a]n act that the law makes punishable.'" 65 Kan. App. 2d at 262. In contrast, the panel found Black's Law Dictionary defined "'case'" as "a civil or criminal action or proceeding" and noted that "[w]hen we refer to a case, we refer to a singular court action which may contain multiple charges or crimes." 65 Kan. App. 2d at 262.

The panel considered the Legislative Summary for S.B. 500 (2024), which amended K.S.A. 8-2110(c), and changed the driver's license reinstatement fee for failure to comply with a traffic citation from $100 per charge to $100 per traffic citation. *Sanders*, 65 Kan. App. 2d at 263. The panel concluded that it was "the failure to comply with the citation (not the individual charges) which results in the assessment of a fee in the amended provision." 65 Kan. App. 2d at 263.

The panel considered similar language in K.S.A. 28-172a(c), which states: "'If a conviction is on more than one count, the docket fee shall be the highest one applicable to any one of the counts. The prosecuting witness or defendant, if assessed the costs, *shall pay only one fee.* Multiple defendants shall each pay one fee.' (Emphasis added.)" *Sanders*, 65 Kan. App. 2d at 263. The panel then considered similar language in K.S.A. 2023 Supp. 32-1049a and K.S.A. 28-176(a).

Ultimately, the panel held that K.S.A. 20-370(a) "specifies 'a crime,'" instead of using the term "per case or per complaint or per traffic citation." *Sanders*, 65 Kan. App. 2d at 264. As a result, the panel held that "K.S.A. 20-370(a) requires a defendant

16

convicted of a crime against a minor victim to pay an assessment fee for each crime committed against a minor." *Sanders*, 65 Kan. App. 2d at 264.

In his reply brief, Aguilar suggests the *Sanders* panel correctly determined K.S.A. 20-370(a)'s language was plain and unambiguous but asserts the *Sanders* panel misinterpreted its plain language. (*Sanders* was filed after Aguilar submitted his initial brief.) Further, Aguilar argues that "[i]t doesn't matter whether the phrase 'a crime' means 'one crime' or 'any crime,' because crimes don't pay fees. Defendants do." Yet, Aguilar's argument is unpersuasive because fees are not assessed per defendant; fees are assessed per crime, per charge, per complaint, or per citation. See K.S.A. 28-172a; K.S.A. 28-176(a); K.S.A. 2024 Supp. 32-1049a.

Again, the relevant language in K.S.A. 20-370(a) states: "[A]ny defendant convicted of a crime . . . in which the minor is a victim, shall pay an assessment fee in the amount of $400 to the clerk of the district court." As the *Sanders* panel noted, K.S.A. 20-370(a) refers to "'a crime'"; it "does not use the term per case or per complaint or per traffic citation." 65 Kan. App. 2d at 264. Had the Legislature intended for K.S.A. 20-370(a) to apply per case, it would have used language indicating so. The district court did not err when it assessed Aguilar $2,400 in Children Advocacy Center fees.

V.    *The District Court Did Not Err When It Assessed the SANE/SART Fees but Erred When It Assessed Witness and Mileage Fees*

*Preservation*

Aguilar acknowledges he did not raise this issue before the district court. Generally, an issue not raised before the district court cannot be raised for the first time on appeal. *Green*, 315 Kan. at 182. As with the Children's Advocacy Center fees, Aguilar

17

claims this issue is "a purely legal question arising on proved or admitted facts that is finally determinative of a case." See *Allen*, 314 Kan. at 283. We will consider this issue.

*Standard of Review*

To the extent this issue involves statutory interpretation, we have unlimited review. *Daniels*, 319 Kan. at 342. And when an award of costs is discretionary, we review for an abuse of discretion. *Puckett v. Bruce*, 276 Kan. 59, 62-63, 73 P.3d 736 (2003). A court abuses its discretion if its action "(1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact." *State v. Younger*, 320 Kan. 98, 137-38, 564 P.3d 744 (2025).

*Discussion*

K.S.A. 22-3801(a) states: "If the defendant in a criminal case is convicted, the court costs shall be taxed against the defendant and shall be a judgment against the defendant which may be enforced as judgments for payment of money in civil cases." K.S.A. 28-172a(a) establishes the amount of the docket fee based on the severity level of the crime. K.S.A. 28-172a(d) states, in relevant part:

"All other fees and expenses to be assessed as additional court costs shall be approved by the court, unless specifically fixed by statute. Additional fees shall include, but are not limited to, fees for Kansas bureau of investigation forensic or laboratory analyses, fees for detention facility processing pursuant to K.S.A. 12-16,119, and amendments thereto, fees for the sexual assault evidence collection kit, fees for conducting an examination of a sexual assault victim, fees for service of process outside the state, witness fees, fees for transcripts and depositions, costs from other courts, doctors' fees and examination and evaluation fees."

18

Aguilar argues, and the State concedes, the district court did not specifically order witness fees or mileage fees in any amount. As a result, those fees must be vacated. See *State v. Alvarez*, 309 Kan. 203, 208, 432 P.3d 1015 (2019) (Fees not set by statute "need to be approved by the district court before they can be taxed."). Thus, the only remaining issue is whether the district court properly ordered sexual assault exam fees.

After announcing Aguilar's prison sentences, the district court continued:

"DNA testing is ordered herein. *Court costs are assessed per statute*. That would include also of the DNA testing fee. The $100 attorney application fee previously assessed at the first appearance is still an order herein. I'll waive the attorney fees. Because there were attorneys that were involved in this case prior to the trial itself. . . . That's my record, that's all I've got. [Prosecutor], can I turn it over to you, anything else I can clean up?

"[PROSECUTOR]: *Sir, did you order the $725 SANE/SART fees? If you did, it's possible I missed it*.

"THE COURT: *It's a court cost, so I just ordered all statutory court costs*. [Defense counsel], anything from you, sir?

"[DEFENSE COUNSEL]: No, Your Honor." (Emphases added.)

Aguilar asserts the district court "stopped short of actually imposing $725 sexual assault kit fees from the bench." Instead, Aguilar contends the district court incorrectly believed it was a standard court cost and did not approve the amount of the fee. As a result, Aguilar argues the fee should be struck. The State claims the district court "clearly expressed its intent to approve the SANE fee" and clearly ordered the fee in its response to the prosecutor's question. The State's argument is more persuasive.

At first, the district court did not refer to the SANE/SART fee. But it specifically ordered: "Court costs are assessed per statute." And "fees for the sexual assault evidence

19

collection kit" and "fees for conducting an examination of a sexual assault victim" are listed as additional fees that may be assessed as court costs. K.S.A. 28-172a(d). When the prosecutor asked whether the court had ordered the "$725 SANE/SART fees," the district court replied: "It's a court cost, so I just ordered all statutory court costs." In this context, it is clear the district court intended to approve SANE/SART fees as a court cost under K.S.A. 28-172a(d).

The district court did not approve witness and mileage fees before taxing these fees against Aguilar. But the district court did approve the SANE/SART fees at sentencing. We affirm the assessment of the SANE/SART fees but vacate the witness and mileage fees.

Convictions affirmed, sentences vacated in part, and case remanded with directions.